EVANS, Regional Director of National Labor Relations Board v. INTERNATIONAL TYPOGRAPHICAL UNION et al.

Civil Action No. 1587.

United States District Court
S. D. Indiana
Indianapolis Division.

Oct. 14, 1948.

Robert N. Denham, Gen. Counsel, David P. Findling, Associate Gen. Counsel, and Winthrop A. Johns, Trial Atty., all of National Labor Relations Board, all of Washington, D. C., and Allen Sinsheimer, Atty., of Cincinnati, Ohio, for petitioner.

Clarence R. Martin, of Indianapolis, Ind., and Van Arkel & Kaiser, of Washington, D. C., for respondents.

SWYGERT, District Judge.

### 1. *The Motion to Dismiss.*

The respondents reiterate the objections to the jurisdiction of the court which they previously asserted in their motion to dismiss the petition for injunctive relief. That motion presented two grounds on which the respondents claimed the court lacked jurisdiction: (1) The questioned constitutionality of Section 10(j) of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 160(j), under which the proceeding was brought, and (2) that only the National Labor Relations Board is empowered by the statute to institute the action and that it cannot delegate such power to the General Counsel. Those questions were disposed of by the ruling on the previous motion to dismiss D.C., 76 F.Supp. 881.

In the present motion to dismiss, the respondents further contend that regardless of the power of a constitutional court to entertain a proceeding for temporary injunctive relief where the main proceeding is litigated in another forum, a constitutional court does not have jurisdiction to hear and determine a contempt action growing out of such proceeding for temporary relief. They say this follows because the entire proceeding before the court, including the contempt action and any orders resulting therefrom, fall when the National Labor Relations Board renders a final order in the main proceeding. To support their contention, respondents point out that this Court in disposing of a similar contention regarding the constitutionality of Section 10(j) stated that the Court's order for temporary relief is "not final because the standard of inquiry in Section 10(j) is the probability of the existence of facts, while the decision of the Board in a Section 10(b) proceeding must rest upon a full hearing and a measure of proof and inquiry extending beyond the standard of probability." Respondents then argue in their brief that a "judgment in civil contempt, unlike a decree for temporary injunction, is a final order premised upon a full hearing wherein petitioner has successfully sustained a heavy burden of proof."

In asserting these arguments, the respondents overlook the essential nature of contempt proceedings. As stated in Myers v. United States, 264 U.S. 95, 103, 44 S.Ct. 272, 273, 68 L.Ed. 577, "These (contempt proceedings) are sui generis, neither civil actions nor prosecutions for offenses, within the ordinary meaning of those terms —and exertions of the power inherent in all courts to enforce obedience, something they must possess in order properly to perform their functions." Historically, the federal courts have always possessed the inherent power to enforce their judgments by contempt proceedings, Bessette v. W. B. Conkey Co., 194 U.S. 324, 24 S.Ct. 665, 48 L.Ed. 997, and this is so irrespective of whether those judgments are interlocutory or final. Finally, the force of respondents' contention is dissipated by pointing out the utter futility of a court's granting temporary equitable relief if it were powerless thereafter to command obedience of its order granting that relief.

The next contention made by the respondents in their motion is that the authority, if any, to initiate contempt proceedings rests with the Board and that no specific delegation of that authority has been made by the Board to the General Counsel. They again assert that the power of the Board to initiate and prosecute injunctive and contempt proceedings is nondelegable, but that if such power may be delegated by the Board, the delegation must be specific. They point out that the decision of the court in overruling the motion to dismiss the original petition held only that the power to institute proceedings for temporary relief under Section 10(j) of the Act was delegable and had been specifically delegated by the Board to the General Counsel. Respondents contend that the question of delegability of the power to institute contempt proceedings and the question of whether such power has been specifically delegated are now at issue before the Court.

As previously pointed out in the Court's opinion on the motion to dismiss the petition for an injunction, the Board in a "Memorandum of Understanding" delegated to the General Counsel the power to initiate and prosecute injunctive proceedings under Section 10(j). The specific language containing that delegation reads:

"General Counsel shall exercise full and final authority and responsibility, on behalf of the Board, for initiating and prosecuting injunction proceedings as provided for in Section 10(j) and (l)."

While the Board did not specifically delegate to the General Counsel the power to bring contempt proceedings, its delegation of the power to initiate and prosecute injunctive actions for temporary relief carries with it, as an incidental and inherent component of that delegation, the authority to institute contempt proceedings growing out of such actions. The contempt proceeding is supplemental to the injunctive proceeding, but nevertheless a part of it. The legal concept of the latter includes contempt actions which may follow the granting of injunctive relief and the subsequent breach of the Court's order or decree.

As to the question of the statutory authority of the Board to delegate to the General Counsel this incidental power to institute contempt proceedings, the previous decision of the Court that the Act permits such delegation of power in relation to injunctive proceedings is applicable. For where the Board may delegate the principal authority, a priori, it may delegate this supplemental power to initiate and prosecute contempt proceedings in aid of the injunctive relief.

A further contention of the respondents is that their present activities cannot form the basis for contempt action because the conduct now complained of was not engaged in prior to the issuance of the decree, was not litigated in that action, and represents a sharp deviation from prior conduct. The analysis of the pleadings by the Court leads to a contrary conclusion. While the conduct now complained of is not identical or of the same nature as that creating the necessity for the decree, it is not unrelated. While the means of violation of Section 8(b) (2), 29 U.S.C.A. § 158(b) (2), differ, the same result is alleged to follow. It is that resulting violation which is proscribed by the Act of Congress and restrained by the decree of the Court.

In their motion to dismiss, the respondents next refer to the report of the trial examiner of the National Labor Relations Board filed August 15, 1948, a week prior to the bringing of this contempt proceeding. Respondents claim that this report "establishes the law of the case, behind which the Court, under the scheme of Section 10(j) should not inquire." A copy of the trial examiner's report has been furnished the Court pursuant to Section 203.-26 of the Rules and Regulations of the Board. That section provides in substance that if the trial examiner recommends dismissal, in whole or in part, of the complaint upon which an injunction under Section 10(j) of the Act has been predicated, the General Counsel shall suggest to the District Court which issued the injunction the possible change in circumstances arising out of the examiner's findings and recommendations.

In interpreting the pertinent sections of the Act, it would appear that nothing short of the Board's order in the principal proceeding under Section 10(b) of the Act, other than the action of the District Court itself, can affect or terminate an injunction issued under Section 10(j). However, a trial examiner's recommendations that a complaint which gave rise to the temporary injunction be dismissed, in whole or in part, may result, if the District Court finds such action justifiable in light of the examiner's recommendations, in a modification or even a termination of the injunction.

■ It is apparent from his report that the trial examiner did not conduct a full inquiry into the activities of the respondents since the decree or in relation to the decree. Furthermore, in his report he has not recommended the dismissal of the complaint in regard to violations of Section 8(b) (2) of the Act, nor have there been suggestions of changes in circumstances which would warrant a modification of the injunction. The decree of the Court has not been modified or superseded, and it thus remains in effect to govern the conduct of the respondents until such time as the National Labor Relations Board determines the issues in the principal proceeding. Accordingly, the question of whether there has been full compliance with the decree is a matter into which the court may properly inquire, regardless of the trial examiner's findings and recommendations.

■ The next ground upon which the respondents base their motion to dismiss relates also to the proceeding before the trial examiner. They say that the General Counsel, having elected to try the issues presented by the instant petition before the trial examiner, is bound by the latter's findings. The General Counsel has effectively answered this contention by pointing out in oral argument that there are two separate proceedings, albeit, both deal with the same course of conduct as that conduct relates to the Labor Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq. There is the instant action, which grows out of the prior proceeding before the District Court for temporary injunctive relief. Then, there is the main proceeding before the Board, which will determine what, if any, permanent relief should be granted. The hearing before the trial examiner dealt only with the issues which the Board must ultimately settle; they had nothing to do with whether the injunction has been obeyed.

■ The final ground relied upon by the respondents in their motion to dismiss relates to whether or not the petition states a cause of action for civil contempt. In considering this ground of the motion, it should be pointed out that the respondents' answer to the petition preceded the filing of their motion to dismiss and that in the motion they allude to allegations of both the petition and the answer in an attempt "to demonstrate that no contempt of the decree is made out." Controverted issues of material facts should not be determined on the pleadings. Proof depends upon the evidence submitted and not upon what the parties claim in their pleadings.

■ The instant petition for judgment in civil contempt presents an ultimate issue of fact of whether the respondents since the injunction have pursued a course of conduct and have caused subordinate local unions and members of the International Typographical Union to give effect to a course of conduct which causes and

attempts to cause employers to discriminate against employees in regard to hiring on the basis of union membership. The petition contains direct allegations of underlying facts to support this claim. The respondents argue that each of these alleged subordinate facts, for one reason or another, is not in violation of the decree. But pleadings are properly read and considered as a whole and construed in their entirety. When thus construed, it seems apparent, as stated by the Court at the beginning of the hearing, that there are genuine issues of material fact presented by the petition and the answer and these should be resolved after a full hearing.

Other matters raised in the motion to dismiss have to do with the standard of proof required in contempt actions and the effect of a showing in such actions that there have been good faith efforts to comply with the injunctive decree. These are matters which more properly belong in a discussion of the case on its merits. Accordingly, they will be dealt with infra.

### 2. *The Case on the Merits.*

Shortly after the issuance of the injunction by this Court the International Typographical Union sent out to its members and subordinate local unions certain instructions and advice. These had the prior approval of the General Counsel. A pertinent part of those instructions having to do with this contempt proceeding reads:

"To preserve the standards of the craft, local unions should submit a clause establishing competency as a prerequisite to employment. Such clause should recognize the joint interests of the employer and the employees in the competency of all persons seeking employment, and should devise procedure whereby the union has equal power with the employer to formulate and conduct tests of competency. Such a clause shall not be utilized as a means of discriminating against any person because of his membership or non-membership in the union."

A short time thereafter the local unions received from the respondents the so-called "form contract," entitled "Contract Provisions Which May Be Proposed in Collective Bargaining During Pendency of Federal Court Decree." This document contains the questioned competency and apprenticeship provisions upon which the General Counsel primarily bases his claim that the respondents have violated the Court's injunction.

### Competency Clause.

The competency clause provides in substance that the work in the composing room shall be performed only by journeymen and apprentices and that the journeymen are defined as (1) employees who have completed their training in accordance with contract clauses dealing with apprentices; (2) journeymen members of the respondent union; and (3) applicants who have first secured a certificate of competency duly issued by an examining board which shall give these applicants the same degree of examination for competency that is given apprentices who seek to become journeymen. It is further provided that the joint examining board shall be composed of two representatives of the employer and two representatives of the local union.

The General Counsel contends that the sending of this suggested contract provision is an attempt by the respondents to cause employers to discriminate against employees on the basis of union membership and therefore is in violation of the decree and of Section 8(b) (2) of the Labor Management Relations Act, 1947. Simply, the question is whether the union member is given a hiring preference over the non-union applicant by this device which, if agreed to by the publisher, would cause him to discriminate in his employing practices against the latter.

Laying aside for the moment consideration of that part of the competency clause providing for a joint examining board, it appears by clear and convincing evidence that not all present members of the International Typographical Union have qualified as journeymen printers by passing the tests required of apprentices who seek to become journeymen. Many who are qualified in only one phase of composing room work, such as proof readers, teletype machine operators, or linotype machine operators, and who were not first required to

take the approved apprenticeship training and examination, have been taken into the union as journeymen when a printing shop or newspaper has been unionized or when the jurisdiction of the union has been extended to include employees performing substituted operations in the composing room. In contrast to this established fact, the examination given apprentices and to which the non-union job applicant is subjected under the proposed contract includes tests with respect to all phases of composing room operations. These tests are designed to qualify the apprentice as an all round journeyman printer. Therefore, it immediately appears that while some union printers have not been required to take the apprenticeship training or examination in order to attain journeyman status, all non-union printers must take such an examination under the proposed contract in order to establish their competency. And this is so regardless of whether or not the job for which the latter applies is one which requires all round training and experience, and regardless also of whether the applicant may be highly qualified by experience to fill the position.

Furthermore, once the printer becomes a member of the International Typographical Union and irrespective of whether he has taken the apprenticeship training and examination, he thereafter is to be regarded by the employer as prima facie qualified as an all round printer and is eligible for consideration for employment without further examination. When contrasted with the requirement that the non-union applicant, regardless of his previous training, experience, ability, prior union membership, or previous qualification under this system, must actually qualify as an all round printer each time he applies for employment before he is eligible for employment, it can be seen that the scheme creates an obstacle to the employment of non-union applicants and facilitates the employment of union applicants. It is thus discriminatory in regard to hire on the basis of membership in the Union.

Another discriminatory characteristic of this proposed hiring procedure has to do with the advantage in point of time which the union member has over the non-union applicant when both seek employment simultaneously from the same employer. The union member, because of his union card, is eligible for hiring as soon as he places his name on the composing room slipboard, a hiring device upon which the names of all eligible job applicants appear. Before the non-union applicant's name may be placed on the slipboard, he must wait to take an examination and obtain a certificate of competency from the joint examining board. Even under the New York City publisher's contract with the International Typographical Union, the normal time lapse between application for and receipt of a certificate is several days. There, however, the examination is confined specifically to the type of work which is covered by the job for which the applicant has applied. Furthermore, it is conducted by an independent agency. Also, there is a possibility, according to the evidence, that the time lapse to be incurred by applicants under this particular arrangement may be shortened so that an applicant may take the test the same day he applies for a job. However, when consideration is given to the fact that under the contract provision proposed by the respondents an all round apprenticeship examination is to be given to such applicants by a board whose control is divided between the union and the employer, with no procedure provided for breaking tie votes, it is unnecessary to illustrate the disadvantages which would be experienced by those who are not union members in getting their names on the slipboard so as to be eligible for consideration when a job is available.

A further discriminatory feature of the competency clause in the form contract relates to the composition of the joint examining board which is to conduct the tests given non-union job applicants. According to the proposed contract, those who seek employment as journeymen otherwise than through the apprenticeship training program, are to be recognized immediately as journeymen by the employer if they are members of the union. If they are not members, they will be referred to a joint examining board consisting of two employer representatives and two union representatives. This board then has the duty to

give the applicant "the same degree of examination for competency as is given to apprentices seeking to qualify as journeymen." Since the union representatives have a controlling veto influence upon the decisions of this joint examining board, the local union has virtual control over the examinations to be given to such applicants and also over all final decisions regarding their eligibility to be considered for hiring. To state it more plainly, the union representatives must approve, as to competency, every non-union job applicant before he is eligible for employment.

The respondents earnestly contend that no ulterior motives or intentions should be imputed to the union's demands that it be given joint and equal control over the machinery by which non-union applicants are to be tested for competency. It is true that they may have a legitimate and vital interest in preserving the standards of their craft. Moreover, there is nothing to indicate that the individuals, whomever they might be, representing the union on these examining committees may not act conscientiously on such committees and render service that would not discriminate against non-union applicants.

On the other hand, it should not be overlooked that all union members are bound by oath to "use all honorable means * * * to procure employment for members of the International Typographical Union in preference to others," and while it will not be presumed that the union representatives would resort to dishonorable means in contravention of the spirit of the laws enacted by the Congress, it is not unlikely that the acknowledged antipathy of International Typographical Union members to non-union members of their craft would assert an influence, consciously or subconsciously, to place the non-union applicant at a disadvantage in qualifying for the certificate prerequisite to employment.

A further consideration in this regard is the past conduct of the respondents in respect to their attitude toward complying with the closed-shop provisions of the Labor Management Relations Act. It was their premeditated failure to observe and comply with those provisions which brought about the injunction. Therefore, it is rea-sonable to assume that that conduct and the point of view which dictated it not only influenced the reasons for proposing this competency testing procedure but also would have a continuing baleful influence upon its actual operation.

Accordingly, it is concluded that by distributing this "form contract" containing the competency clause, regardless of the suggestion or insistence that it be used without deviation, the respondents have violated the decree of this Court by attempting to cause employers with whom the local unions are negotiating to encourage union membership by discrimination in regard to hire, in violation of Section 8(a) (3) of the Act.

### Apprenticeship Clauses.

The "form contract" proposed by the respondents as a basis for the local unions' negotiations with employers also contains clauses pertaining to the selection, training and advancement of apprentices. These clauses provide in substance that there shall be a Joint Apprenticeship Committee composed of an equal number of representatives of the local union and the employer. This committee, according to the proposed contract, shall have full control over all of its provisions in regard to apprentices, including the right to decide whether the employer has facilities sufficient to enable an apprentice to become a finished craftsman, the selection of the apprentices, and the conducting of apprenticeship examinations.

In appraising these clauses it should be pointed out that the applicant for employment as an apprentice is not a member of the International Typographical Union, because he cannot become a member according to the union's "Laws" until he is actually employed. Therefore, it does not appear that the joint and equal control of the union over the actions of the apprenticeship committee could cause employers to discriminate in *hiring* apprentices on the basis of union affiliation. On the other hand, the union, by virtue of its equal or veto power over apprenticeship committee matters, as later shown, does cause the employer to discriminate in regard to tenure and conditions of employment of appren-

tices to encourage membership in the International Typographical Union. Because the union has virtual control of the committee, its approval is necessary to the advancement of the apprentice as he strives for journeyman status. He can neither advance toward nor finally become a journeyman without the approval of the union representatives.

It is not to be denied that the International Typographical Union has a legitimate and vital interest in the selection and training of apprentices. But that interest must be fitted into an arrangement which will coincide and not conflict with the national law. What has been said about the infirmities of the joint examining board provisions in the competency clause of the "form contract" applies in many respects to the joint apprenticeship committee arrangement. Moreover, exemplification is unnecessary to demonstrate how apprentices, if they are beholden to the union representatives for advancement and graduation into journeyman status, may be influenced through the workings of this arrangement to become union members. Regardless of the union's legitimate purpose to induct these apprentices into its membership, it cannot legally cause the employer to participate with it in an endeavor to encourage union membership. The union, of course, may encourage such membership by all lawful means; but it may not cause the employer to aid in that encouragement.

These proposed clauses regarding apprentices are to be viewed against the background of the evidence in this case pertaining to the antipathy of members of the International Typographical Union to working with non-union men and to the strenuous efforts by the respondents to avoid the impact of the Labor Management Relations Act on the "Laws" of the International Typographical Union and its long-established closed-shop arrangements with employers. When thus viewed, the conclusion is inevitable that unless a third disinterested party is included in any joint apprenticeship committee arrangement, the proposed contract is an attempt to cause the employers to engage in discriminatory practices forbidden by the Act. Such conduct by the respondents was restrained by the injunction.

### Foreman Clause.

A further claim that the respondents have indulged in contumacious conduct arises from the provisions in the "form contract" requiring that the foreman in the composing room shall be a member of the International Typographical Union and that he shall have exclusive control over the hiring, supervision and discharge of the composing room employees. In this connection the General Counsel adverts to the oath which binds all union members to use all honorable means to procure employment for members in preference to all others. He then contends that the foreman clause in the "form contract" is a part of the general device by which the respondents are attempting to cause employers to discriminate in their hiring as between union and non-union applicants for employment.

It is not clear whether the General Counsel contends (1) that the respondents' request for and insistence upon the use of this foreman clause is violative of the decree because of the oath above mentioned or (2) that such conduct is nonetheless contemptuous if the obligation of the oath is suspended by the union, either through unilateral action or contractual agreement with employers.

It will be noted that the International Typographical Union has not changed its "Laws" so as to relieve foremen of the obligation of their membership oaths. But the evidence shows that the individual respondents, as members of the Executive Council of the International Typographical Union, have stated during the course of post-injunction contract negotiations that the oath or obligation of foremen will be considered suspended insofar as it might be construed to require them to discriminate against non-union applicants for employment. This statement had the approval of the Union's Committee on Collective Bargaining Policy in its report to the August, 1948, Annual Convention of the International Typographical Union. The report was adopted by the convention. Further,

it appears from the evidence that some of the contracts recently approved by the respondents contain language which may be construed as having a similar effect of suspending the oaths which bind union members who are foremen. For example, the Louisville and Syracuse contracts provide:

"The foreman is recognized to be management's representative in the composing room and for administrative purposes is responsible solely to the Publisher, and the Union shall not discipline him for carrying out the instructions of management, provided those instructions are not in violation of this agreement."

Whether or not individual foremen under the above circumstances will feel free to disregard their oaths in their personnel relations on behalf of the employer is highly speculative. But, aside from the individual reactions of the foremen, the respondents have expressed in various ways, other than by changing the International Typographical Union "Laws," a recognition that the Union considers as suspended any obligation or oath which might bind union foremen, as agents of the employers, to discriminate in contravention of the Labor Management Relations Act. Therefore, applying to the evidence the standard of clear and convincing proof which is required in contempt actions, the issue is resolved against any contention of the General Counsel that the request and insistence of the respondents for the foreman clause violates the decree *because* of the existence of the oath taken by union members.

The question then becomes whether the conduct of the respondents in requesting or insisting upon the adoption of the foreman clause is contemptuous where the foremen are not bound by oath in their personnel relations on behalf of the employer to prefer union applicants for hire. That is, have the respondents, by proposing or demanding that only members of the Union be hired as foremen and that the hiring and firing of all composing room personnel be the exclusive province of the union foreman, attempted to cause employers to encourage union membership?

Foremen, as supervisors, are excluded by definition from the category of "employee" by Section 2(11) of the Act, 29 U.S.C.A. § 152(11). And Section 14, 29 U.S.C.A. § 164, exempts employers from treating supervisors as "employees" for the purpose of any law relating to collective bargaining. So that insofar as other foremen are concerned, the Act does not protect them from an employer's discriminatory preference of union foremen, whether that preference results from the personal decision or the contractual obligations of the employer. Since such a discrimination is not in violation of Section 8(a) (3) of the Act, the union's conduct here could not be found to violate Section 8(b) (2) or the injunction decree in that respect.

In treating this exact problem the trial examiner in his intermediate report, made the following observation:

"A contractual undertaking that foremen be members of a union is not contrary to law unless the employer is restrained or coerced into agreeing to it. Normally, it is not to be inferred in the absence of other proof that the employment of union foremen operates, without more, to establish closed shop or preferential hiring conditions in violation of Section 8(a) (3)."

That statement adequately expresses the views of the Court. And it would appear that the General Counsel was not of a different mind when he approved the "Instructions and Advice" sent by the respondents to subordinate unions after the issuance of the injunction. That document contained the following statement:

"The following is not prohibited by the decree: It is agreed that all foremen of Composing Rooms shall be members of the union in good standing."

It therefore seems logical to conclude that it is not unlawful, insofar as Section 8(b) (2) is involved, for the respondents to request that an employer agree to employ only union members as foremen. It would further appear that there is nothing inherently unlawful in providing that the foreman, who is a union member, shall do the hiring. While it may be that union foremen have strong prejudices against

non-union printers it cannot be assumed that such prejudices would result invariably in discriminatory practices. Furthermore, the fact should not be overlooked that the foreman is selected by the employer and is the latter's subordinate.

The solution to this question lies in the analysis of the background of the events which brought about the injunction. The adamant resistance of the respondents to the Labor Management Relations Act and their insistence on maintaining closed-shop conditions must necessarily be considered in appraising this foreman clause. Likewise, their contumacious conduct with respect to the competency and apprenticeship clauses in the form contract cannot be overlooked.

Offsetting these evidentiary factors, which are of circumstantial nature as they relate to this problem, is the evidence that the proposal to provide by contract for the employment of foremen from union membership and to repose in those foremen the control over hiring in the composing rooms came initially from certain publishers; that many proposals of publishers have contained this questioned clause; and that little, if any, objection has been raised against it by employers.

After considering all these varied factors, the conclusion is reached that the proposed foreman clause of the "form contract," and the variations of it contained in the negotiated contracts, are not hiring devices which have inherently discriminatory characteristics, such as the competency and apprenticeship clauses. That which would render the respondent's conduct contemptuous in this regard is the insistence by them that the foreman clause must be in collective bargaining contracts. The reason for such a conclusion is that such insistence requires a motive or intent, and that motive or intent could be found only in the conduct of the respondents which both before and after the injunction has disclosed a persistent objective to continue some kind of a closed-shop condition in the newspaper industry.

On the question of whether there has been an unyielding insistence by the respondents, the evidence is in conflict. Some letters sent by the respondents indicate that contracts which did not include the foreman clause of the "form contract" would not be approved by the Executive Council of the respondent union. On the other hand, the respondents' testimony is to the effect that although no contracts have been approved which did not contain the questioned clause, there has been no cause for insistence. In weighing this evidence, the court concludes that there has been no clear and convincing proof that where an employer has objected to this clause the respondents have refused to approve a proposed contract, although otherwise acceptable, because it did not provide for a union foreman who would be in exclusive control of the hiring and discharge of composing room employees.

## Deviations from "Form Contract" Provisions

One of the General Counsel's Charges in his petition for judgment in civil contempt is that the respondents have insisted upon the adoption of the "form contract" without substantial change or deviation with respect to the competency and apprenticeship clauses. Although there is some indication to that effect, there is substantial evidence that the respondents have not insisted in every instance upon the adoption of the exact proposed clause covering competency requirements of employees. But such deviations as have occurred do not materially alter the discriminatory character of this provision, except as noted hereafter. The respondents introduced contracts executed subsequent to the injunction by subordinate local unions and newspaper publishers in Kansas City, Missouri, and Louisville, Kentucky, in which the only deviation from the questioned competency clause is a procedure for resolving deadlocks among the members of the joint examining board.

It is the opinion of the Court that if the contract were to provide a simple nonpartisan method of breaking tie votes, which would be available promptly when needed, that the ostensibly discriminatory features of the apprenticeship clauses might be rectified; but that the provision of such a method with regard to the com-

petency examination clauses would have no similar absolutory effect. Although it is entirely likely that some such procedure would render this proposed contract provision less discriminatory than it is without such change, nevertheless, the competency clause appearing in the "form contract" contains discriminatory characteristics and potentialities, as has been shown above, that no procedure for breaking tie votes can eradicate. Accordingly, the fact of whether there has been unyielding insistence by the respondents for the adoption of the competency clause without substantial deviation is not determinative of whether the injunction has been violated. There is an added reason for this conclusion: if, as the Court has already determined, the proposed contract containing the competency clause is violative of the injunction decree, then the distribution of the "form contract" is itself an act of contempt—a conscious effort on the part of the respondents, in spite of the injunction, to cause employers to discriminate in regard to hiring on the basis of union membership—which could only be rendered more or less flagrant by their unwillingness or willingness to bargain for substituted or modified provisions.

The contract entered into between the New York City publishers and Local No. 6 of the International Typographical Union appears to deviate materially from the "form contract" with regard to the competency clause. First, the contract goes beyond the use of a bipartisan examining board, with or without tie-breaking procedure. Second, the contract does not require the same degree of examination that is given apprentices, such as is provided for in the "form contract". The evidence is that the tests administered under the New York contract are designed to determine the competency of the applicant only in that classification of composing room work in which he is applying for employment, rather than his all round competency as a printer. Third, the examination is conducted by disinterested examiners designated by the New York City Board of Education and these examiners are required to follow procedures established by the School of Printers' Apprentices of New York City. Moreover, the contract provisions for examinations to qualify as journeymen appear on their face, as shown later, to require the same examination for both union and non-union applicants. And this the General Counsel concedes.

However, it is the contention of the General Counsel that this clause is in fact discriminatory if it is given the interpretation which he believes was given it by respondent Randolph in this testimony. But such an interpretation is not warranted, because the testimony of respondent Randolph as to his intentions in negotiating the contract is not controlling as to the import of the language used, where that language is not ambiguous.

The definition of journeymen who may qualify for employment under this contract is not confined, as in the "form contract," to journeymen members of the International Typographical Union or to those who have received a certificate of competency from a joint examining board. According to this contract, the definition of journeyman includes all persons who have worked for any of the publishers who are parties to the contract. This would create no distinction on the basis of present union membership. The definition also includes persons "who have passed an examination recognized by both parties * * * and have qualified as journeymen in accordance therewith." Again, this would create no distinction between union and non-union applicants. For example, if one of the examinations recognized by both parties is the examination given apprentices under the International Typographical Union "Laws," both present and former members of the International Typographical Union who have taken such examination may qualify. Likewise, former government printing office employees would be eligible for employment, regardless of present union membership, if the examination conducted by that office is recognized by the parties.

The evidence regarding the operation of the procedure for testing competency for journeyman status in New York is that several non-union applicants have taken and passed these examinations and have

been employed. There is no evidence that those who have failed to pass the tests have considered themselves the objects of discrimination.

No provision is made in the apprenticeship clauses of the New York City publishers' contract for procedure to break tie votes of the joint apprenticeship committee. But it appears that the contract may otherwise contain important deviations from the "form contract" in regard to the apprenticeship program. It states that apprentices may qualify as journeymen by completing the apprentice training provided in the contract, which is under the control of the joint apprenticeship committee. In addition, it provides that employees may qualify as journeymen if they have passed "a qualifying examination under procedures heretofore recognized by the Union and the Publishers."

No clear or satisfactory evidence has been presented to show what procedures have been "heretofore recognized" by the union and the publishers, although it seems reasonable to assume that such procedures are other than those contained in the present contract. Otherwise this latter provision would be mere surplusage. Without knowledge of the nature of the procedures referred to, it is impossible to appraise adequately these apprenticeship clauses. So that, in the absence of further proof, no conclusion can be reached as to whether these provisions do vary materially from those in the "form contract."

The foregoing attempt to analyze the New York City publishers' contract is made for only one reason: to determine the present legal status of the Chicago situation. The final allegations of the petition for civil contempt are that Local No. 16 of the International Typographical Union has been on strike against the Chicago newspapers and the Hammond, Indiana, *Times* since March 27, 1948; that these strikes have been caused solely or in part by the alleged contumacious conduct; and that since the issuance of the decree these strikes have been supported by the respondent International Typographical Union by means of the continued payment of strike benefits.

Whatever the earlier demands of Local No. 16 in its post-injunction negotiations with the employers against whom strikes are now being conducted, the evidence is that about August 23, 1948, the president of Local No. 16 notified a representative of the Chicago publishers that the provisions of the New York publishers' contract would be acceptable as a basis for further negotiations and that about September 16, 1948, the membership of Local No. 16 authorized its officers to resume contract negotiations with the publishers on the basis of "the Union Security provisions of the recently negotiated New York newspaper contract covering jurisdiction, employment, competency and apprentice training" and adopted an addition to the competency clause which prescribes a procedure for breaking a tie vote.

There is no evidence to indicate that since that time the local has adopted a different basis for negotiations. So that, since it has not been shown by clear and convincing evidence that the New York City publishers' contract is in violation of any terms of the decree, the Court cannot conclude that the conduct of the respondent International Typographical Union in relation to the Chicago situation since August 23, 1948, is in violation of the decree. Further, it does not appear that the negotiations between Local No. 16 and the Hammond publisher have assumed any other basis than the customary procedure of adopting the terms of the Chicago agreement.

Of course, such a determination is not to be considered a conclusion that the respondents' conduct in relation to the Chicago negotiations before August 23, 1948, was not in violation of the decree. Nor does it affect the question of whether the New York City publishers' contract was drafted in an unique situation not approximated or possible in Chicago and Hammond. While the evidence is not sufficient for the Court to find that the provisions now being offered by Local No. 16 are unlawful, this is not to say that they are lawful. If the New York City situation cannot be substantially duplicated in Chicago and Hammond and the respondents are

supporting Local No. 16 in suggesting provisions which are unfeasible or impossible of operation, the occasion may arise later for the presentation of these facts to the Court.

### Good Faith and Delay in Bringing Contempt Proceedings.

The respondents contend that since March 27, 1948, they have attempted in good faith to comply with the injunction.

It is true the evidence shows that some, if not all, of the pertinent provisions of the competency and apprentices clauses of the "form contract" were derived from a contract entered into between Local No. 6 and the New York Employing Printers' Association, and that these provisions were drafted and proposed by the employers. It is significant to note, however, that this contract was negotiated and agreed upon prior to March 27 and during a time when the respondents were pursuing the course of conduct which indicated the necessity for the injunction.

Further, the respondents' evidence indicates that the "form contract" was drafted and forwarded to the local unions by the respondents pursuant to the advice of their counsel.

The short answer to the respondents' contentions is that a showing of good faith efforts to comply with an injunction is not a defense to an action for judgment in civil contempt. Lustgarten v. Felt & Tarrant Mfg. Co., 3 Cir., 1938, 92 F.2d 277; National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 1942, 130 F.2d 919. Also, it is no defense to such proceeding that the person violating the injunction acted upon advice of counsel. Ulman v. Ritter, C.C.W.Va.1896, 72 F. 1000; Eustace v. Lynch, 9 Cir., 1935, 80 F.2d 652.

But despite the respondents' protestations of good faith efforts to comply with the decree, a consideration of all the evidence convinces the Court that the respondents have deliberately attempted since the issuance of the injunction to accomplish the objective against which the injunction was directed, namely, the continuance of closed-shop conditions in the newspaper industry.

As a part of their asserted defense of good faith the respondents place particular emphasis on the fact that the General Counsel did not initiate this contempt proceeding until approximately five months after the issuance of the injunction. They point out that the "form contract" was distributed to local unions shortly after April 1, 1948, and then ask, justifiably perhaps, why the General Counsel did not act much sooner. Further, respondents allude to the negotiations of local unions with employers on the basis of the "form contract" and the fact that these negotiations in many instances have culminated in agreements. They say that the General Counsel had knowledge of these negotiations. Respondents then argue that because the General Counsel has not previously attacked these contracts, they have been misled by the delay in having their post-injunction conduct brought into question.

The General Counsel has attempted to refute these contentions by pointing out the necessity for and the incidental delay of an investigation into respondents' conduct before instituting a contempt action. Whatever the facts may be on that score, the issue of whether there has been undue delay on the part of the General Counsel, is here unimportant to a determination of whether the injunction decree has been violated. A delay in instituting contempt proceedings after the alleged misconduct became known to the officer charged with policing the injunction could only be a material factor if there were some doubt as to whether the respondents' conduct has been contumacious. The evidence in this instance is clear and convincing that the respondents have violated the injunction issued in this proceeding.