237 F.2d 20
 AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL, LOCAL 88, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Swift & Company, Intervenor.
SWIFT & COMPANY, a corporation, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Amalgamated Meat Cutters and Butcher Workmen of North America, AFL, Local 88, Intervenor.
 No. 12891.
 No. 12931.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 14, 1956.
 Decided June 22, 1956.
 Rehearing Denied September 13, 1956.
 Petition for Rehearing Denied September 13, 1956.
 Second Petition for Rehearing Denied October 8, 1956.
 Petition for Rehearing In Banc Denied October 8, 1956.
 
 Mr. Mozart G. Ratner, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Messrs. Martin F. O'Donoghue and Thomas X. Dunn, Washington, D. C., were on the briefs, for petitioner in No. 12891 and intervenor in No. 12931.
 Mr. G. Carroll Stribling, St. Louis, Mo., with whom Mr. Earl G. Spiker, Washington, D. C., was on the briefs, for intervenor in No. 12891 and petitioner in No. 12931.
 Mr. Duane Beeson, Attorney, National Labor Relations Board, of the bar of the Supreme Court of California, pro hac vice, by special leave of Court, with whom Mr. Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, was on the brief, for respondent. Mr. Winthrop A. Johns, Counsel, National Labor Relations Board, also entered an appearance for respondent.
 Before FAHY, WASHINGTON and DANAHER, Circuit Judges.
 FAHY, Circuit Judge.
 
 
 1
 The major issue in these appeals is whether the National Labor Relations Board erred in ordering the Amalgamated Meat Cutters & Butcher Workmen of North America, Local 88, hereinafter called the Union, to cease and desist from certain practices found by the Board to violate section 8(b) (4) (A),[1] the "secondary boycott" provision of the National Labor Relations Act. A subsidiary question is whether this court should declare that the Board's order also applies to certain other activities of the Union.
 
 
 2
 The Union's membership is principally composed of persons engaged in the wholesale and retail distribution of meat and meat products in St. Louis, Missouri. These cases arose out of attempts of the Union to organize the salesmen employed by Swift & Company to sell meat at wholesale to retail stores in the St. Louis area. On September 10, 1953, the Union began picketing Swift's St. Louis Independent Packing Company plant. The very next day, however, Swift secured an order from a state court which enjoined all further picketing. The Union then turned to the tactics which became the subject of the proceedings before the Board.
 
 
 3
 The Union's membership included many persons who were responsible for buying meat at wholesale for retail stores or markets, terms we use interchangeably. Some of these were the owners of the stores themselves, while others were employees to whom owners or managers had delegated purchasing authority. The Union called upon these members to aid in its organizational drive by refusing to purchase from the Swift salesmen unless the latter joined the Union. This request was made at Union meetings, in Union literature mailed to its members, and by personal appeals to the buyers by Union representatives who visited the markets. Because of the Union's plea for support a number of Union members curtailed their purchases from Swift salesmen or ceased purchases altogether. The Secretary-Treasurer of the Union also told the members that if their employers "insisted" on buying Swift products, they should "sell it and display it," but the record discloses only one instance where an owner overruled a buyer. In the other instances where the owners or managers were informed of a buyer's refusal to patronize the Swift salesmen they were unwilling to interfere, sometimes indicating a fear of Union reprisals.
 
 
 4
 A majority of the Board found that the Union had violated section 8(b) (4) (A) when its representatives called at the meat markets and there induced buyers who were employees of the market owners to refuse on behalf of their employers to buy Swift products from Swift salesmen, with an object of forcing or requiring the employers to cease handling Swift products and doing business with Swift salesmen.[2] The Board's order requires the Union to cease and desist from this type of activity. The Board declined, however, to pass on the legality of the Union's conduct "within its own organization," that is, the appeals at Union meetings and in Union literature.
 
 
 5
 In No. 12,891 the Union petitions us to set aside the Board's order, contending that the finding of a section 8(b) (4) (A) violation is not supported by the evidence and cannot be squared with either the language or the intent of that section. In its answer to this petition the Board requests the enforcement of its order. On the other hand, Swift, the petitioner in No. 12931, asks the court to clarify the Board's order by declaring that it covers the Union's activities "within its own organization."
 
 
 6
 The Union says, in the first place, that its appeals were not addressed to "employees," because the buyers were performing a managerial function and hence were acting as agents of their employers. Reliance is placed upon section 2(2) of the Act,[3] which defines the term "employer" to include "any person acting as an agent of an employer." The applicable definition, however, is that of "employee" in section 2(3),[4] since section 8(b) (4) (A) prohibits the inducement of "employees." That term is defined as including "any employee" with certain specific exceptions, such as supervisors. There is no broad exception for agents of employers, and the Union does not contend that the buyers fall within any of the specific exceptions. Consequently we think that the buyers are "employees" within the meaning of section 8(b) (4) (A), and the fact that they may also be agents of employers does not eliminate them from the scope of that section. The policy of the Act does not require a departure here from the ordinary meaning of the statutory language. See Phelps-Dodge Corp. v. NLRB, 313 U.S. 177, 191, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; NLRB v. Armour & Co., 10 Cir., 154 F.2d 570, 574, 169 A.L.R. 421, certiorari denied, 329 U.S. 732, 67 S.Ct. 92, 91 L.Ed. 633.
 
 
 7
 The Union says that its appeals were directed at only one employee of each employer, while the section 8(b) (4) (A) proscription is limited to the inducement or encouragement of "employees" of any employer. This provision, however, must be read in conjunction with the following general rule of statutory construction embodied in 61 Stat. 633 (1947), as amended, 1 U.S.C. § 1 (1952), 1 U.S.C.A. § 1:
 
 
 8
 "In determining the meaning of any Act of Congress, unless the context indicates otherwise —
 
 
 9
 "words importing the singular include and apply to several persons, parties, or things;
 
 
 10
 "words importing the plural include the singular; * * *."
 
 
 11
 Application of this rule to the instant case seems "necessary to carry out the evident intent of the statute." First National Bank v. State of Missouri, 263 U.S. 640, 657, 44 S.Ct. 213, 215, 68 L.Ed. 486. The effect of the Union's activity is the same in this case, where many employees of various employers are involved, as it is where many employees of a single employer are involved. Congress must have intended section 8(b) (4) (A) to apply to this type of situation.[5]
 
 
 12
 A related argument of the Union is that it did not induce or encourage "concerted" activity by the buyers. It relies on NLRB v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, where the Supreme Court held that the actions of pickets in seeking to persuade two employees of a neutral employer not to cross a primary picket line were not violations of section 8(b) (4) because there was no inducement to concerted conduct. The Court stated:
 
 
 13
 "A union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees. Generally, therefore, such actions do not come within the proscription of § 8(b) (4), and they do not here." Id., 341 U.S. at page 671, 71 S.Ct. at page 964.
 
 
 14
 The Court considered the case to involve merely an individual solicitation directed at an employee to make his own determination not to cross the picket line. In the instant case, however, the appeals were to the employees as members of a group, encouraged parallel action, and were not incidental to primary picketing. It would be artificial to say that the Union did not encourage a unity of effort, and therefore concerted action, on the part of the employees. We think this type of inducement is designed to secure concerted conduct and does not fall within the scope of the Rice Milling decision. Cf. Piezonki v. NLRB, 4 Cir., 219 F.2d 879, 883; NLRB v. Denver Bldg. Council, 10 Cir., 193 F.2d 421, 424; NLRB v. Service Trade Chauffeurs, 2 Cir., 191 F. 2d 65, 67; Schauffler for and on behalf of NLRB v. United Association of Journeymen, 3 Cir., 230 F.2d 572, 574. See, also, Comment, 50 Mich.L.Rev. 315, 326-30; Note, 62 Yale L.J. 1111, 1120-22.
 
 
 15
 The Union next argues that it did not induce the buyers to "refuse" to purchase from the Swift salesmen, because a "refusal" within the meaning of section 8(b) (4) (A) implies action contrary to the express or implied orders of the neutral employer. But the employees did refuse in the ordinary sense of that word. The law is in a state of some confusion with regard to whether this statutory term should be given its ordinary meaning. See, e. g., Sand Door & Plywood Co., 113 N.L.R.B. No. 123; Pittsburgh Plate Glass Co., 105 N.L.R.B. 740; Rabouin d/b/a Conway's Express, 87 N.L.R.B. 972, aff'd sub nom. Rabouin v. NLRB, 2 Cir., 195 F.2d 906; Note, 64 Yale L.J. 1201. We do not feel called upon to decide this issue. The Board found, with ample support in the evidence, that the "discretion vested in the buyers by their employers was one to be exercised solely in the employer's interest and was not a discretion to accomplish some ulterior aim of the buyers themselves." The Board concluded, "It seems plain that the Union here induced employees to refuse to perform or to refrain from performing for their employers a service they had theretofore performed, i. e., to determine solely on the basis of objective criteria whether the purchase of Swift products was in the interest of their employer." The Board's delineation of the employees' duties as agents of their employers is supported not only by the evidence but by the general law of agency. See Restatement of Agency §§ 387, 424 (1933). It is clear from the Board's findings that the Union appealed to the employees to abuse the discretion delegated to them, for it asked them to cut off purchases because of the Union's interests regardless of whether such action might or might not be advantageous to their employer. Their accession to such appeals constituted a "refusal."[6]
 
 
 16
 The Union also contends that since buying is not one of the services specifically enumerated in section 8(b) (4), nor similar to those which are listed, it does not fall within the reach of that section. The section's proscription applies to inducements not "to use, manufacture, process, transport, or otherwise handle or work on any goods * * * or to perform any services." The Union's ejusdem generis argument is that the activities specifically enumerated are usually performed by employees whereas buying is generally handled by owners or supervisors. But in the context of this case buying clearly is one of the "services" the employees are required "to perform." The principle of ejusdem generis "gives no warrant for narrowing alternative provisions which the legislature has adopted with the purpose of affording added safeguards." United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598. Congress here provided "added safeguards" by inserting the "alternative provisions" "otherwise handle or work on any goods * * * or to perform any services," so that the section would cover employee activity reasonably calculated to produce the results which Congress wished to prevent.
 
 
 17
 The Union's final statutory argument is that the Board erred in finding that the "object" of the boycott was "forcing or requiring" any market owner to cease doing business with Swift. The Union contends that its real object was to persuade the Swift salesmen to join the Union. True, no doubt, this was the ultimate object, but that does not insulate the Union's actions where the Board finds on sufficient evidence, as here, that such ultimate object is sought by prohibited means. A finding of an illegal intermediate object is all that is required. "It is not necessary to find that the sole object of the strike was that of forcing the contractor to terminate the subcontractor's contract." NLRB v. Denver Bldg. Council, 341 U.S. 675, 689, 71 S.Ct. 943, 952, 95 L.Ed. 1284. The Union argues, however, that in any event it cannot be said that an object of the refusal to purchase was "forcing or requiring" the cessation of business between any market owner and Swift, because "once the buyers ceased purchasing, business relations between the markets and Swift were automatically terminated and no action by the market owner was required or even contemplated." We cannot accept such a narrow definition of terms, for it is not consonant with the intent of the statute and is not necessitated by its language. No pressure could have been more successful in "requiring" the market owners to cease purchasing from Swift salesmen than the means here employed.
 
 
 18
 Apart from these statutory arguments the Union contends that the evidence is insufficient to support the finding that there was inducement of "employees." There was no direct evidence that any of the buyers contacted by Union representatives at the markets were employees. The Union argues that such evidence is required in this case because some of the Union's members were market owners or supervisors. But a finding of the Board need not necessarily be supported by direct evidence. See Radio Officer's Union of Commercial Telegraphers Union v. NLRB, 347 U.S. 17, 48-49, 74 S.Ct. 323, 98 L.Ed. 455; NLRB v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368. We think that the finding in question is sufficiently sustained by circumstantial evidence, especially in light of the failure of the Union to undertake to establish, as it had ample opportunity to do, that none of the buyers solicited were employees. The record shows that the majority of the Union's members were employees within the meaning of section 8(b) (4), and that the Union's business representative admitted he was "almost constantly calling on * * * [Union] members in the shops and urging them to buy only from union salesmen." In view of these considerations, we think the Board was justified in concluding that "at least some" of the Union members appealed to were employees.
 
 
 19
 The final argument of the Union is that even conceding the boycott technically falls within the terms of the statute, the circumstances of this case make the boycott "primary" rather than "secondary"; and since section 8(b) (4) was intended to ban only secondary action, the Board's order must be vacated. We will assume that this interpretation of the statute is correct. See NLRB v. Denver Bldg. Council, supra 341 U.S. at pages 686, 692, 71 S.Ct. 943, 95 L.Ed. 1284; Di Giorgio Fruit Corp. v. NLRB, 89 U.S.App.D.C. 155, 162, 191 F.2d 642, 649, 28 A.L.R.2d 377, certiorari denied 342 U.S. 869, 72 S.Ct. 110, 96 L.Ed. 653; Comment, 50 Mich.L.Rev. 315. We cannot agree, however, with the Union's characterization of its activity. It contends that the boycott was primary for two reasons. In the first place, it says, "Refusal to patronize one's adversaries in a labor dispute is the classic `primary boycott.'" But this was not a consumer boycott. Here the appeals to the buyers were not designed simply to induce them to withdraw their personal patronage from Swift, but rather were meant to move them to stop purchasing on behalf of their employers and thus to cause a cessation of business between the employers and the Swift salesmen. This type of union activity falls squarely within the intent of the statute. But, the Union further maintains, its appeals encouraged action by the buyers at the primary situs of the dispute and therefore were not illegal, though that situs was also a neutral employer's place of business. The Union cites a number of "common situs" cases, including Moore Dry Dock Co., 92 N.L.R.B. 547; Sales Drivers Helpers & Bldg. Const. Drivers, etc., v. NLRB, 97 U.S.App.D.C. 173, 229 F.2d 514, certiorari denied 76 S.Ct. 1025; NLRB v. Chauffeurs, Teamsters, 7 Cir., 212 F.2d 216; and NLRB v. Service Trade Chauffeurs, 2 Cir., 191 F.2d 65. The direct appeals here made to the employees of neutral employers, however, can hardly be classed with the "incidental effect" upon such employees which we stated in Sales Drivers v. NLRB, supra, might in some circumstances be a permissible by-product of picketing directed against the primary employer. See, also, Piezonki v. NLRB, 4 Cir., 219 F.2d 879, 882-83; NLRB v. Service Trade Chauffeurs, 2 Cir., 191 F.2d 65, 67. We agree with the Board's disposition of this issue. It stated:
 
 
 20
 "The `roving situs' decisions upon which the Respondent [Union] relies are inapposite here. Where picketing is involved, or other forms of inducement directly aimed at employees sought to be organized, the Board must, and does, recognize a certain degree of inevitable inducement of the employees of neutrals. In the absence of conduct directly aimed at the primary employees, however, there is no question of incidental as distinguished from direct inducement. Here the principal inducement shown was a direct appeal, on the very premises of neutral employers, to the latter's employees to refrain from performing one of their assigned tasks."
 
 
 21
 Since we hold that the Board did not err in finding that the Union's activities at the meat markets constituted violations of section 8(b) (4) (A), we will enforce the Board's order insofar as it prohibits such inducements and any similar ones occurring at the markets. Swift asks us to go further and declare that the order also proscribes the appeals made at Union meetings and through its bulletins. Swift contends that the evidence clearly proves these inducements to be illegal. Hence, the argument goes, they are covered by the order, phrased in the broad terms of the statute, and this court should so declare so as to clear up the ambiguity engendered by the Board's refusal to decide whether these activities violated the statute. We agree that there is ambiguity, but we do not feel free to dispel it in the manner requested by Swift. No doubt the Board may fashion an order so that it not only prohibits the actions specifically found to be illegal but also activities of a somewhat different nature which might be resorted to in an attempt to circumvent the Board's decision. See International Brotherhood of Electrical Workers v. NLRB, 341 U.S. 694, 705-706, 71 S.Ct. 954, 95 L.Ed. 1299; American Newspaper Publishers Ass'n v. NLRB, 7 Cir., 193 F.2d 782, 799; Evans v. International Typographical Union, D.C.S.D.Ind., 81 F.Supp. 675, 678. Here, however, not only did the Board specifically refuse to pass upon the legality of the appeals made at the Union's meetings and through its literature, but a prior Board decision, Western Inc., 93 N.L.R.B. 336, raises considerable doubt whether the Board would consider these appeals to be violations of section 8(b) (4) (A). In these circumstances we cannot interpret the Board's order to apply to such activities. We agree with the Union's contention that on the findings made by the Board its order, broad in terms, is not to be construed as prohibiting the activities at Union meetings or through the mailing of literature, the validity of which the Board declined to decide.
 
 
 22
 The order of the Board, as interpreted by this opinion, will be enforced.
 
 
 23
 It is so ordered.
 
 
 
 Notes:
 
 
 [1]
 61 Stat. 140-41 (1947), 29 U.S.C. § 158 (b) (4) (A) (1952), 29 U.S.C.A. § 158 (b) (4) (A). The section reads as follows:
 "(b) It shall be an unfair labor practice for a labor organization or its agents —
 * * * * *
 "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * *"
 
 
 [2]
 The dissenting member agreed with the Trial Examiner, who had exonerated the Union
 
 
 [3]
 61 Stat. 137 (1947), 29 U.S.C. § 152(2) (1952), 29 U.S.C.A. § 152(2), amending 49 Stat. 450 (1935)
 
 
 [4]
 61 Stat. 137-38 (1947), 29 U.S.C. § 152 (3) (1952), 29 U.S.C.A. § 152(3), amending 49 Stat. 450 (1935)
 
 
 [5]
 If the dicta in Joilet Contractors Association v. NLRB, 7 Cir., 202 F.2d 606, 612, certiorari denied, 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349, is contrary to our conclusion, we find ourselves unable to agree
 
 
 [6]
 A Union argument closely allied to the one just discussed is that there was no inducement of action on the part of the employees "in the course of their employment," because they were not required by the terms of their employment to continue purchasing from Swift salesmen. But, as has been seen, they were obliged not to cease this purchasing simply because of the interests of the Union. Moreover, a function of most of the buyers was to determine with whom orders should be placed, and consequently the making of the decisions here involved was plainly in the course of their employment
 
 
 On Petitions for Rehearing
 
 24
 PER CURIAM.
 
 
 25
 In a petition for rehearing the Union urges that our treatment of the meaning of "employees" to include the buyers, though they might also have been agents of the employers, is both erroneous and inconsistent with the Board's uniform interpretation of the term "employees", as recently exemplified by the following statement of the Board in Swift & Co., 115 N.L.R.B., No. 105, decided March 9, 1956:
 
 
 26
 "It was the clear intent of Congress to exclude from the coverage of the Act all individuals allied with management.[2] Such individuals cannot be deemed to be employees for the purposes of the act."
 
 
 27
 This is the latest of a series of decisions in which the Board has excluded from employee bargaining units persons whose interests were found to be so closely allied with those of the employer that they should be considered representatives of management rather than "employees." Our opinion, therefore, was too broadly phrased. Nevertheless we are of the view that the buyers in the present case were so identified with employee and Union activity as to be within the statutory meaning of "employees" for purposes of section 8(b) (4) (A). The Union contends that even if such identification would bring them within the meaning of "employees" in a representation proceeding, the crucial issue here is whether the buyers were approached by the Union in their capacity as representatives of management or as employees. Assuming this to be a proper statement of the issue the outcome remains the same, for the Board treated the inducement or encouragement as directed to the buyers as employees, with ample support in the record.
 
 
 28
 In Swift's petition for rehearing we are again urged to hold that the Board erred in refusing to pass upon the legality of the appeals made at the Union's meetings, or to remand to the Board to require it to decide this issue. Under the circumstances here presented we do not think the statute made such a decision mandatory upon the Board, or that we are required to remand the case for such a decision by the Board.
 
 
 29
 The petitions for rehearing are denied.
 
 
 
 Notes:
 
 
 [2]
 "See Section 2(2) and (3) of the Act, * * *."