193 F.2d 782
 AMERICAN NEWSPAPER PUBLISHERS ASS'N
v.
NATIONAL LABOR RELATIONS BOARD.
NATIONAL LABOR RELATIONS BOARD
v.
INTERNATIONAL TYPOGRAPHICAL UNION et al.
NATIONAL LABOR RELATIONS BOARD
v.
CHICAGO TYPOGRAPHICAL UNION NO. 16 et al.
UNION EMPLOYERS SECTION OF PRINTING INDUSTRY OF AMERICA, Inc.
v.
NATIONAL LABOR RELATIONS BOARD.
 No. 10329, 10331, 10332 and 10356.
 United States Court of Appeals, Seventh Circuit.
 Dec. 27, 1951.
 
 Elisha Hanson, Arthur B. Hanson, both of Washington, D.C. (Hanson, Lovett & Dale, Washington, D.C., of counsel), for American Newspaper Publishers Assn.
 David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, George J. Bott, General Counsel, and Fannie M. Boyls, John F. Preston, Jr. and Duane Beeson, all of Washington, D.C., for National Labor Relations Board.
 John C. Butler, Chicago, Ill., H. THomas Austern, Washington, D.C., for amicus curiae.
 Clarence R. Martin, Indianapolis, Ind., Gerhard P. Van Arkel, Henry Kaiser, Eugene Gressman, all of Washington, D.C., for International Typographical Union, and Chicago Typographical Union No. 16, and others.
 William R. Bowes, Chicago, Ill., Gerard D. Reilly and Charles Edward Rhetts, both of Washington, D.C. (Reilly, Rhetts & Ruckelshaus, Washington, D.C., of counsel), for Union Employers Section of Printing Industry of America.
 Before KERNER, LINDLEY and SWAIM, Circuit Judges.
 SWAIM, Circuit Judge.
 
 
 1
 This opinion will undertake to cover four cases. The principal parties involved are the National Labor Relations Board, the International typographical Union, some of its subordinate local unions and its officers and agents, the American Newspaper Publishers Association, the Chicago Newspaper Publishers Association and the Union Employers Section of Printing Industry of America,Inc. These parties will be referred to herein as the "Board," "ITU," "ANPA," "CNPA" and "PIA," respectively.
 
 
 2
 The ANPA is a membership corporation, the members of which are publishers of newspapers throughout the country. Although ANPA does not serve as the representative of its members for the purpose of collective bargaining with labor unions, it has for many years had a Special Standing Committee in existence to collect and disseminate information pertinent to collective bargaining, and to advise and cooperate with member companies with respect to their relations with labor unions. Through its Special Standing Committee ANPA has participated in general policy discussions with international unions and has been signatory to arbitration agreements with international unions which the local unions and individual publishers have customarily adopted. The CNPA is an association of the publishers of the principal Chicago newspapers.
 
 
 3
 The ITU was organized in 1852 as an amalgamation of previously existing typographical societies some of which had existed since 1815. The ITU's membership now consists of some 90,000 members belonging to about 850 locals. The ITU now asserts jurisdiction over composing room employees who are organized into subordinate local unions and mailing room employees who are organized in separate Mailers Locals.
 
 
 4
 The PIA, is a New York corporation which at all times material herein has been designated by its various member commercial publishing companies as their agent for the purpose of bargaining collectively with labor organizations, including the ITU, concerning the rates of pay, wages, hours of employment and other conditions of employment of their respective employees.
 
 
 5
 The first of the four cases, No. 10329, is a petition by the ANPA to review and modify an order of the Board, entered in the Board's case No. 9-CB-5, which directed the ITU, its officers, agents and representatives, to cease and desist from certain unfair labor practices in which the Board had found the ITU and its agents had been and were engaging in their dealings with the ANPA and various member newspaper publishers.
 
 
 6
 The second, case, No. 10331, is a petition by the Board of enforcement of this same order of the Board.
 
 
 7
 The third case, No. 10332, is a petition by the Board for enforcement of its order directed to the ITU and to its Chicago local to cease and desist from certain unfair labor practices in which the Board found that they had been and were engaging.
 
 
 8
 The last case, No. 10356, is a petition by the PIA to review and modify an order entered by the Board in the Board's case No. 2-CB-30, directing the ITU to cease and desist from certain unfair labor practices in which the Board found that the ITU and its local unions had been and were engaging in their dealings with the PIA.Case No. 10329.
 
 
 9
 In November 1947 the General Counsel of the Board, as a result of charges filed by the ANPA, filed a complaint against the ITU and its officers and agents, alleging that the ITU and its officers and agents, had been and were engaging in certain unfair labor practices in violation of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq., hereinafter referred to as the "Act."
 
 
 10
 The complaint alleged various unfair labor practices by the ITU and its agents in violation of § 8 of the Act, in that, since August 22, 1947, they had (1) caused or attempted to cause the publishers to hire only members of the ITU as employees, and thus to discriminate against non-union employees in violation of § 8(a)(3), which constituted a violation by the ITU and its agents of § 8(b)(2) of the Act; (2) caused or attempted to cause publishers to pay money "in the nature of an exaction, for services which were not performed, or not to be performed," in violation of § 8(b)(6) of the Act; (3) restrained or coerced employer members of the ANPA in the selection of their representatives for the purpose of collective bargaining and the adjustment of grievances by insisting and demanding, and causing their subordinate local unions to insist and demand that the employers employ only foremen who were members of the ITU, which restraint or coercion was in violation of § 8(b)(1)(B) of the Act; and (4) restrained and coerced employees in the exercise of the rights guaranteed by § 7 of the Act by refusing and causing the subordinate local unions to refuse to bargain in good faith with the employer publishers. The complaint did not allege that this was in violation of § 8(b)(3) of the Act, but did allege that it was a violation of § 8(b)(1)(A).
 
 
 11
 The ITU filed an answer denying generally the material allegations of the complaint. This proceeding before the Board will be referred to herein as the ANPA case.
 
 
 12
 Hearings on this case were held in various cities and on various dates from December 9, 1947 to May 18, 1948. For the purpose of the hearing only, this case was consolidated with the Board's case No. 13-CB-6, which was pending on a complaint issued against the ITU and its subordinate local union as a result of charges by the Chicago Newspaper Publishers Association. This latter case will be referred to here-after as the Chicago case. A petition to enforce the Board's cease and desist order in the Chicago case is our case No. 10332.
 
 
 13
 Facts Prior to Taft-Hartley.
 
 
 14
 For a better understanding of the actions, demands and practices of the ITU which led to the complaints being filed in these cases it is necessary to understand some of the basic principles on which the ITU was founded and which the ITU claims to be vital to its continued security. Prior to about 1885 the ITU did not "bargain" with employers as that term is presently understood. Instead it adopted a schedule of prices and other conditions of employment under which its members were willing to work. No ITU member would work for an employer except for the pay and under the conditions so fixed by the ITU. One such condition was that its members could only work in a composing room where all the employees were members of the union. A member violating this condition was penalized by being suspended or expelled from the ITU. Other conditions of employment on which the ITU traditionally insisted were: (1) that the composing room be under a foreman who was a member of the ITU and who had the power to hire and fire employees, (2) the right of the ITU to determine the kind of work to be assigned to its members, (3) the right of its members to refuse to work on "struck work" (work coming from or going to a shop considered unfair to union labor), (4) that the employers recognize the "apprentice system" of the ITU, and (5) the right of the ITU to compose all of the print used in publishing a newspaper.
 
 
 15
 On this last condition is founded the ITU's claim to "reproduction" or "setting bogus." This condition requires payment by publishers of substantial amounts regularly for composition work which is never used nor intended for use. Commercial advertisers often submit their advertisements to publishers in the form of a matrix (an impression of thin cardboard of an advertisement, including the printed matter thereof) which serves as a mould from which a metal plate is made for use on the printing presses. An advertisement submitted in this form goes directly to the stereotype room where a place is made to be used in the printing of the advertisement. The ITU permits publishers to publish advertising submitted in this manner only on the condition that after the advertisement is published a tear sheet containing the advertisement be taken from the published newspaper and that members of the ITU then be permitted to set the advertisement in type, place it in a form, run a proof of the form and correct any errors. in other words, the ITU insists on doing exactly the same composing room work on an advertisement submitted on a matrix as it would do if the advertisement had been submitted in the form of flat copy with the advertisement typewritten or drawn by hand. After a calculation has been made of the time consumed in setting the type on such "reproduction" work, the type so set is tossed into the type melting box.
 
 
 16
 These traditional demands of the ITU relating to a closed shop, union foremen, struck work, jurisdiction and bogus were set out in detail in the General Laws of the ITU which were in force at the time of the hearing before the Board on the ANPA
 
 
 17
 A and Chicago cases. The ITU, its subordinate locals and its members are all subject to its Constitution, By-Laws, General Laws and Convention Laws.
 
 
 18
 International Organization of ITU.
 
 
 19
 By its Constitution the ITU declared that it alone was vested with power to establish subordinate local unions and that "its mandates must be obeyed at all times and under all circumstances." Its Constitution provided that it should issue to locals only charters which are conditioned on the local being "forever and under any and all circumstances" subordinate to an in compliance "with all the requirements of the constitution, by-laws and general laws or other laws of the International Union as they may from time to time be altered or amended," and "that said union (the local) shall for all time, be guided and controlled by all acts and decisions of the International Typographical Union as they may from time to time be enacted." The local charters so authorized also provided that "so long as the said union adheres to these conditions, this charter (is) to remain in full force; but upon infraction thereof, the International Typographical Union may revoke this charter, thereby annulling all privileges secured hereunder."
 
 
 20
 Article II.--Laws, of the ITU Constitution provided: "Section 1. The International typographical Union shall exercise complete and unrestricted authority to define its jurisdiction; enact; enforce and amend as provided in its constitution and by-laws all laws for the government of the International Union, its subordinate unions and its officers and members throughout its entire jurisdiction."
 
 
 21
 The Constitution provided that the officers of the ITU should consist of the President, three Vice Presidents and the Secretary-Treasurer, and that these officers should constitute the Executive Council which "shall have general supervision of the business of the International Union and of subordinate unions."
 
 
 22
 Under Article X.--Penalties, it is again provided that: "Any subordinate union * * * which shall neglect or refuse to obey any law or legal mandate of the International Typographical Union or Executive Council may be fined or have its charter suspended by the Executive Council."
 
 
 23
 It is also provided that every person admitted as a member shall subscribe to an oath that he will to the best of his ability abide by the Constitution and By-Laws of the union; that he will at all times support the laws, regulations and decisions of the ITU and that he will " * * * use all honorable means within my power to procure employment for members of the International Typographical Union in preference to others; * * *."
 
 
 24
 In addition to the centralized control over its locals and members as shown above, the ITU also under its laws exercises a close supervision over all collective bargaining by its locals and on occasion actively participates therein. Its General Laws, Article III, provide that: "The laws of the local union not affecting wages, hours or working conditions and the laws of the International Typographical Union shall not be submitted to arbitration." This Article provides further that subordinate unions are not only required to submit all proposals for a new contract, or extension or amendment thereof, to the ITU President for review and approval as complying with requirements of the ITU laws, before presentation to the employer,but they must also gain submit the negotiated contract to the ITU President before the local executes it. If a serious disagreement develops between a local and an employer, the local is required to notify the ITU President before any strike action is taken. The President or his agent then participates in the negotiations. This procedure was followed several times during the negotiations involved in these cases. If no agreement is then reached, the Executive Council may approve a strike. In such case strike benefits are paid to members of the local; the ITU defense funds are made available, and members not supporting the strike may be expelled.
 
 
 25
 The General Law reiterate the ITU's "unalterable policy" that all composing room work "belongs to and is under the jurisdiction of" the ITCU. Article V of the ITU General Laws declares that in a union shop the foreman is the only recognized authority, and that in reduction of force and in rehiring and hiring new employees for the composing room he shall be governed by priorities of the persons involved as determined by Article X of the General Laws.
 
 
 26
 Events in 1947.
 
 
 27
 Bearing in mind the absolute control of the ITU over its subordinate locals and members as shown above, let us examine the manner in which that power was used in the transactions here under consideration. Upon passage of the Taft-Hartley Act in June 1947, to become effective August 27, 1947, the ITU at once launched a campaign for the apparent purpose of expressing its disapproval and defiance of the Act and for the further purpose of instructing its subordinate locals and members on methods of avoiding the impact of the various provisions of the Act on the traditional practices and policies of the ITU. In fact, while the Act was still under consideration by Congress, the ITU clearly indicated what was to come in the event the Act was passed. In the March 1947 issue of The Typographical Journal its readers were told:
 
 
 28
 "For nearly a century--long before there was any thought of laws to 'legalize' the closed shop--the International Typographical Union operated on the closed shop principle. It has been the accepted practice in the printing industry. * * * It will continue to so operate in spite of misguided or prejudiced legislators, their influential backers, or any unconstitutional 'laws' enemies of labor may be able to put on the books.
 
 
 29
 " * * * It is the inalienable right of a free people to refuse to work under intolerable conditions. It is intolerable and unthinkable that union printers would work with non-union men under conditions fostered by the 'open shop.' When confronted with that choice members of the I.T.U. will do what comes naturally."
 
 
 30
 In May 1947, Woodruff Randolph, President of the ITU, testifying before a Congressional Committee said: 'At no time has the International Typographical Union or any local thereof operated on other than a closed shop basis and whether it can make contracts thereof or not, it will continue to function on that basis."
 
 
 31
 In the July 1947 issue of The Typographical Journal, the first issue after the passage of the Taft-Hartley Act, President Randolph wrote:
 
 
 32
 "The Law as Adopted is Unenforceable
 
 
 33
 "The old adage that you can lead a mule to water but you cannot make him drink applies as well in this case. It is recognized that collective bargaining is not only a good thing, but an absolute necessity. So is water to a mule, but there are times when he will not drink.
 
 
 34
 "This is one of the times when organized labor approaches collective bargaining with at least a mulish disposition. So far as the Typographical Union is concerned, we do not intend to have any of our rights or prerogatives, enjoyed for a hundred years, set aside by laws adopted under the lash of party leadership in Congress inspired by representatives of big business whose aim is to wreck organized labor.
 
 
 35
 * * * * * *
 
 
 36
 " * * * It is a safe prediction that if the Supreme Court of the United States does not set Congress right, organized labor will do the job the hard way.
 
 
 37
 * * * * * *
 
 
 38
 There is no law that can compel our members to work for our employers under any conditions not acceptable to us. If we cannot make a contract for a closed-shop, we need not make a contract. If the conditions prevailing in a shop are not to our liking, we need not work in that shop."
 
 
 39
 In the August 1947 issue of The Typographical Journal another article by President Randolph appears containing the following statements:
 
 
 40
 "A condition of closed-shop exists in the printing industry as regards employment of composing room workers. Theories will not change that condition.
 
 
 41
 * * * * * *
 
 
 42
 "The theory of the Taft-Hartley Law is that now an employer can 'shoe horn' some non-union men into a union composing room and be protected against our men walking out. That is theory only. The condition is that our members will walk out.
 
 
 43
 "The theory of the employers protection in 'opening' a closed-shop is that a union will violate a contract if the men walk out. The condition is that union men do not need to have a contract."
 
 
 44
 By a series of bulletins which were sent to all subordinate unions, beginning about July 1, 1947, the latter were advised of and directed to follow a common policy which was to be followed by the ITU and all of its locals. These bulletins first explained that, pursuant to § 102 of the Act, 29 U.S.C.A. § 158 note, the locals might sign, before the effective date of the Act, a one year closed shop contract. The ITU directed that on contracts expiring before August 22, 1947, the locals might execute one year extension agreements, provided a sixty day cancellation provision was included. For contracts expiring after the date the locals were instructed to give notices sixty days before expiration stating that: "To the extent required by § 8(b)(3) of the Labor Management Relations Act this is to offer to meet and confer for the purpose of 'negotiating' conditions of employment but reserving all rights provided by said LRMA § 8(d) that such obligation does not compel this union to agree to a proposal or require the making of a concession."
 
 
 45
 These bulletins warned the locals not to be stampeded into signing a contract before August 22, 1947, just to get a closed shop contract because, "We will maintain our right to work only with union men under any circumstances." With this communication the ITU sent its locals its "Form A" to be used in making the one year extension agreements. This form contained the contract provisions set out below which President Randolph considered "musts" in any contract which the ITU would approve: (1) An agreement that the contract might be terminated at any time by either party upon sixty days written notice and that neither party shall bring any legal action against the other for any breach of contract. (2) An agreement that if any part of the contract is declared illegal or inoperative by any agency or court, the entire agreement shall thereupon become null and void. (3) An agreement that the union is to be considered the exclusive bargaining agent for all composing room employees, and that the term composing room employees is subject to definition and limitation only by the local union and the ITU and, further, that if such a definition by the union should not be desirable to the employer, the employer may, on ten days notice, declare the contract null and void, but that during said ten day period, the employer would not appeal to any agency for a determination of that issue. (4) An agreement that each party to the contract shall have as its only recourse against the other for damages alleged to be due for any breach of the contract, an appeal to the Joint Standing Committee provided therein and that no award for damages shall in any event exceed the sum of $25.00, except on a claim for wages. (5) An agreement that while the parties intend to preserve the process of collective bargaining, there is no intention to violate any Federal or State law, but in the event that any action should be brought attacking the validity of the agreement or seeking to prevent its terms being carried out,either party may declare the agreement null and void. (6) An agreement that no member of the union shall be required or expected to cross a picket line established by a subordinate union of the ITU.
 
 
 46
 The locals were also cautioned not to verbally agree to or sign anything without the approval of the President of the ITU. Other bulletins assured the locals that (1) they could not be compelled to make contracts, (2) they could not be compelled to work under conditions which were unsatisfactory to them, (3) they could name the conditions under which they would work after the expiration of their existing agreements, and (4) they could collectively refuse to work for any employer who refused to meet their conditions.
 
 
 47
 In its annual convention, held August 16 to 22, 1947, the ITU adopted a resolution approving the report of its committee on collective bargaining. This report asserted the determination of the ITU to " '* * * maintain our historic rights and prerogatives * * *," denounced the Labor Management Relations Act as having provisions which are "impracticable, and unworkable," and "inequitable and unjust to organized labor" and "unconstitutional and invalid." The report pointed out that the Act did not compel "the signing of contracts" and stated that refraining from signing was "not violation or evasion of the law." The resolution therefore declared: "It will be our policy to refrain from signing contracts in order that we avoid agreeing or seeming to agree, or voluntarily accepting the conditions created by such a relationship under the Labor Management Act of 1947."
 
 
 48
 The report also stated that the Act expressly provided that it should not be construed to require an individual employee to render labor or service without his consent, nor to make the quitting of his labor by an individual employee an illegal act. The ITU policy therefore declared: "Upon the expiration of existing contracts, and until the laws above referred to are amended and free collective bargaining is again reorganized, our members may accept employment only from employers who are willing to employ them under the 'Conditions of Employment' which the several unions adopt, after approval by the Executive Council of the I.T.U."
 
 
 49
 The policy so adopted admonished the locals to give proper notices of cancellation of existing contracts and to engage in collective bargaining "to the extent required by law" but again reminded the locals that the Act did "not compel either party to agree to a proposal or require the making of a concession."
 
 
 50
 The locals were warned (1) not to qualify as representatives under the Act except after approval by the Executive Council, (2) not to enter into "no strike" agreements or contracts of any kind without the approval of the Executive Council, and (3) not to file any unfair labor practice charges or petition for investigation or representation without the approval of the President and Executive Council. The Executive Council was given the power to "interpret, construe and enforce the policy."
 
 
 51
 It is significant that the same convention amended § 43 of Article IV of the By-Laws of the ITU by giving the Executive Council the right to summarily expel (instead of suspend) any subordinate union, member or members refusing to accept and observe a decision of the Executive Council. Section 2 of Article II of the General Laws was also amended to prohibit any local union from signing any contract guaranteeing its members to work "unless such contract is in accordance with International law andpolicyand approved as such by the International President." (Our emphasis.)
 
 
 52
 Conditions of Employment.
 
 
 53
 Forms of Conditions of Employment were distributed to the locals with instructions for their effective use. They were told that the first step was to give proper termination of existing contracts. They were told then to submit to employers an "offer" which would propose (1) that there be no signed, verbal or any other kind of contract, and (2) that the employer recognize that there is no obligation on the part of the union or its individual members to do other than as specified in the Conditions of Employment. They were then to discuss with the employer fair wages and other local questions not covered by the Conditions of Employment. However, the locals were told not to agree even on wage or hour proposals o employers which were acceptable. The locals were repeatedly told that they must "follow ITU policy no matter what happens." They were told that if they found it necessary to walk off the job they were to assign no reason for it. " * * You will be refraining from working because you want to do so and for no other reason."
 
 
 54
 The Conditions of Employment form which the locals were required to use in lieu of a collective bargaining contract stated in its first paragraphs:
 
 
 55
 "This schedule of the Conditions of Employment, as hereinafter stated, is in nowise a contract nor is it an offer susceptible of acceptance by an employer in any manner to infer that there has been any meeting of the minds in collective bargaining to attain the results hereinafter prescribed solely by the union.
 
 
 56
 "This policy of prescribing conditions of employment by union action only is for the purpose of retaining all legal rights of the union and its individual members.
 
 
 57
 ".................. Union No. ......, a subordinate union of the International typographical Union and subject to all of its laws, regulations and decisions, hereby, and with the consent and support of the International Typographical Union, establishes the wages, hours and conditions under which members of ............................ Union No. .... shall work, as stated in the schedule and provisions herein, on and after ............, 19...., subject only to such alteration, amendment or withdrawal as may be authorized by a vote of the membership as prescribed by local laws and approved by the International Typographical Union.
 
 
 58
 "No local union officer, chapel chairman, or other member of the union shall be authorized to act as an 'agent' of the union for any purpose or act prohibited by state or federal laws. The union promulgating these conditions of employment accepts no obligations as a collective bargaining agent as defined by the Labor Management Relations Act of 1947. Any act of members of the union to quit their employment is a matter of their individual rights and prerogatives.
 
 
 59
 "Failure on the part of any employer of members of the union, to provide employment at the standards set forth in these conditions will be evidence such employer has locked out members of our union and with the consent of the International Typographical Union such members may be classified as locked out and other union members may be notified of such lockout."
 
 
 60
 This statement of policy in the Conditions of Employment form is followed by (1) Schedule for work and the wages to be paid therefor with blanks for the amount of wages to be filled in after local ascertainment of what employers will pay and the approval of the ITU; and (2) Provisions as to apprentices.
 
 
 61
 Under "Miscellaneous" the Conditions of Employment form contained provisions (1) permitting the members to refuse to work on struck work, (2) requiring "reproduction or "setting bogus," (3) stating that office rules "shall in no way abridge the civil rights of members, or their rights under International Typographical Union laws," (4) requiring that in any necessary decrease or increase in force, such increase or decrease shall be made according to the seniority priorities of the members, (5) giving any member discharged the right to appeal to the local union, then to the Executive Council and finally to a convention, all pursuant to ITU laws, (6) giving the members the right to seek other employment when any condition in the office becomes unsatisfactory, and to refuse to work when they consider themselves unable or unwilling to perform the duties imposed by the office, (7) stating that: "Members will work only under direction and supervision of a foreman of the composing room who is a member and who, as foreman, shall have full and complete control over the hiring and discharge of members doing any work in said composing room," and, finally, (8) that the composing room shall be operated under the laws of the International Typographical Union and of the local union.
 
 
 62
 The control of the ITU over its locals in this "no contract" policy was shown by a statement in The Typographical Journal which said that one month after the effective date of the Act, " * * * not one contract signed after the effective date (had) reached the contract department of the International Typographical Union from any local union located in the United States. The flow of contracts was stopped as simply and effectively as turning off a spigot."
 
 
 63
 But the Conditions of Employment plan of the ITU was not accepted by the publishers as readily as the ITU had anticipated. The ANPA Special Standing Committee urged publishers not to accept it, advising that a collective bargaining contract was necessary for their protection. General Counsel Denham of the Board publicly stated that the ITU "no contract" policy violated the amendments to the Act. On September 23, 1947, a complaint was issued against the ITU and its Baltimore local alleging that the application of the "no contract" policy violated the Act.
 
 
 64
 To avoid the charge that it was violating its obligation to bargain in good faith by adhering to its "no contract" policy, the ITU, by a letter from its President dated October 7, 1947, announced a change of policy. under the new policy employers who insisted on a contract instead of operating under the Conditions of Employment were to be offered a Form P-6A Contract prepared by the ITU. It was explained to the locals that they could "easily comply" with the requirement of good faith bargaining by offering to sign this Form P-6A Contract if the employers would sign it.
 
 
 65
 Form P-6A.
 
 
 66
 The P-6A Form of contract provided that the contract should continue in effect "unless and until terminated by either party by written notice of sixty days," and contained Clauses, (a) through (i(, which: (a) recognized the union as the exclusive bargaining representative of all employees subject to the union's jurisdiction; (b) delegated to the union the power to make and enforce, without interference by the employer, laws, rules and decisions for conditions under which its members might seek or accept employment; (The ITU by this clause alone would retain the unilateral framing of conditions of employment.) (c) agreed "that the General Laws of the International Typographical Union, in effect January 1, 1947, not in conflict with law or this contract, shall govern relations between the parties or conditions not specifically enumerated herein"; (d) required the employer to assign to journeymen and apprentices all work that had been traditionally assigned to them (as defined by the Union), and provided that if the employer was not satisfied with the union's decision the employer could, on ten days notice, declare the agreement null and void; (e) agreed that any refusal of union members to work with non-union employees would not constitute a breach of the agreement; (f) recognized that no member of the union shall be required or expected to cross a picket line established by any subordinate union; (g) bound the employer not to require its employees to work on "struck work"; (h) provided for a Joint Standing Committee, composed of equal numbers of representatives appointed by each of the parties, to pass on disputes arising as to construction of clauses of agreement, and arbitration in the event that the Joint Standing Committee failed to agree except that local union laws and General Laws of the ITU not affecting wages, hours or working conditions were not to be subject to arbitration; and (i) limited liability for breach of agreement to not more than $25.00 except on claims for wages.
 
 
 67
 When this Form P-6A was distributed to the locals they were told that they could not change in any way the sixty day termination provision nor provisions (a) to (j), both inclusive. It was explained that the sixty day cancellation provision was absolutely essential because:
 
 
 68
 "It puts the employer in the position where he is likely not to have union employees working for him if he hires non-union men; if he brings non-union matter for you to work on, or if he tries to take away your jurisdiction. The reason we adopted a 'no contract' policy was to protect ourselves against the above acts which the employer could perform to our destruction.
 
 
 69
 "NOW--with the 60-day notice requirement of the T H L, a local union can terminate form P-6A on 60 days' notice and begin 'bargaining in good faith,' again, even 'Denham style,' and be free at the end of the 60 days.
 
 
 70
 * * * * * *
 
 
 71
 "It may be after the employer 'bargains in good faith' with us he will take another look at our 'Conditions of Employment' idea which was successful and acceptable enough until the T H L and Denham."
 
 
 72
 The Chicago Negotiations.
 
 
 73
 The local unions followed the ITU instructions to the letter. A typical example of the operation of these plans of the ITU is shown by the negotiations in Chicago. On July 21, 1947, the local gave notice that the current contract would expire in three months and requested negotiations as required by the contract. The union offered a one year extension of the contract with the additional of Form A, as instructed at the time by the ITU. The publishers rejected this because of the sixty day cancellation clause which they contended gave no stability to their arrangements with the union. They then proposed a straight one year extension with the additional clause that no term was to be interpreted contrary to law. Throughout all the proceedings both sides in suggesting contracts provided that wage scales would be negotiated later. At the August 21st meeting of the negotiators, the local revealed its future intention to sign no contracts and to work according to unilateral Conditions of Employment. From this time on the publishers refused to discuss wages at all so as not to reveal prematurely the acceptable wage scale which the union could incorporate into its Conditions. The publishers insisted upon agreement first as to some contract framework.
 
 
 74
 On October 21, 1947, the existing contract expired. On that day the local offered Form P-6A. This was rejected. On November 8th President Randolph of the ITU entered the negotiations. Mr. O'Keefe, the Secretary of the CNPA, testified that when President Randolph participated in the negotiations he also followed closely the policy prescribed by the ITU; and that in the meeting held by representatives of the union and publishers on November 20, 1947, Mr. Randolph stated to the representatives of the publishers:
 
 
 75
 "We have got now what we intend to keep, courts or no courts, Congress not-withstanding.
 
 
 76
 "We are going to maintain that. We will not work with non-union men, we will not handle the non-union product, we will keep our jurisdiction. We haven't got a contract now, we have already reached that objective. * * * We can still strike for money. The thing we do not have is money. We have got all the other things,we have had them for years and are not going to give them up now or ever."
 
 
 77
 The CNPA refused to recognize a unilaterally established wage scale without a lawful contract of reasonable duration. Thereupon, on November 24, 1947, the Chicago local went out on strike.
 
 
 78
 On November 17, 1947, the ANPA filed charges against the ITU and its officers resulting in a Board complaint which was issued November 21, 1947. This is the ANPA case, Nos. 10331 (the enforcement petition) and 10329 (the charging complaint's petition to review) here. On January 12, 1948, the CNPA filed charges against the Chicago Typographical Union No. 16 and the ITU resulting in a Board complaint as of January 13, 1948. This is the Chicago case, No. 10332 here. On January 2, 1948, the Board also issued a complaint against the ITU and various locals upon the charges of the Union Employers Section of the Printing Industry of America, Inc., and other printing associations, filed December 5, 1947. This is the PIA case No. 10356 here.
 
 
 79
 During the time the hearings on the complaints in the ANPA and Chicago cases were still in progress before a trial examiner, the Board, acting by its Regional Director for the Ninth Region, filed, in the United States District Court for the Southern District of Indiana, a petition for an order restraining and enjoining the ITU and its agents, pursuant to § 10(j) of the Act, from continuing their unfair practices pending final decision and order by the Board. Upon a showing of probable violation of the Act, the Court, on February 25, 1948, entered an order restraining the union from violating § 8(b)(1)(A) and § 8(b)(2) of the Act. Evans v. International Typographical Union, D.C., 76 F.Supp. 881.
 
 
 80
 Later Negotiations.
 
 
 81
 Later conduct of the union is best shown in reference to the negotiations in New York City with the newspaper publishers. There the existing contract expired on March 31, 1948. There again there were the usual proposals by the union and the usual employer refusals to discuss wages without some assurance of a contract for a definite period. On March 31, 1948, the ITU sent instructions to its locals on how to comply with the injunction. A new form for one year contract (to be cancelled in sixty days if the union won the Board cases) was sent out. This new form was similar to Form P-6A except that it omitted clause (e) and part of clause (g). In New York the negotiations dragged along, with some show of desire by the local to agree to terms other than the specified. At the time the hearings in the ANPA case closed, these negotiations had not been concluded.
 
 
 82
 One other occurrence should be noted. On April 12, 1948, Detroit Local No. 18 entered into a different form of contract with the Graphic Arts Association of Michigan. Pertinent portions of the contract were as follows:
 
 
 83
 "Statement of Intent.
 
 
 84
 " * * * it is the purpose and intent * * * of the Graphic Arts Association * * * to continue the cooperative and mutual relations with the Union. it will be the Employers' Section's purpose to maintain all prior practices in the operations of its composing rooms to the fullest extent permitted by the law, and to provide the maximum possible union security. The Employers' Section and its members will not undertake any activity which will in any sense undermine or jeopardize the Union's strength or security or the well being of its members. It is the intent of the Employers' Section and its members limit composing room work to jobs obtained on a normal account basis. * * "
 
 
 85
 The contract also adopted rules and laws of the unions "not in conflict with law." There was a clause limiting hiring to the foreman. Finally, workers were required to fulfill certain competency requirements. An applicant was required either to be a member of the union or else to show a certain amount of training and pass certain tests, such tests to be given by union members in conjunction with employer representatives.
 
 
 86
 On October 14, 1948, Judge Swygert found the ITU in contempt of his injunction because of the competency clause in the proposed form for a contract sent out at the end of March. Evans v. International Typographical Union, D.C., 81 F.Supp. 675.
 
 
 87
 The success of the ITU's bargaining policies during these periods is shown by the finding of the Trial Examiner in the ANPA case, No. 9-CB-5, that:
 
 
 88
 " * * * up to the time of the injunction hearing in March 1948, 682 scales within ITU policy had been put into effect. Of these, 368 were in the newspaper and 314 in the commercial field. The figures are further broken down as follows:
 
 Conditions of employment .. 271
 P"6A agreements ............ 18
 Other contracts ............. 4
 Voluntary increases ....... 296
 Interim openings ........... 93
 Extension agreements ........ 2
 
 89
 "No contract was approved during this period which did not contain a 60-day cancellation clause. * * * "
 
 
 90
 These figures show that the ITU's desire for work at increased wages, without giving up its traditional policies and practices, was granted by the publishers in most cases and that the offer of the P-6A contract served its purpose of driving the publishers to accept what seemed the lesser evil, the Conditions of Employment and voluntary increases without any contract.
 
 
 91
 Decision and Order of the Board.
 
 
 92
 § 8(b)(2).
 
 
 93
 The Board found that the ITU had violated § 8(b)(2) of the Act which prohibits a labor organization or its agents from coercing or attempting to coerce an employer to discriminate against an employee in violation of § 8(a)(3) of the Act. The Board found that the ITU and its agents did this by applying coercive pressure on employers in the newspaper industry in order to compel the publishers to maintain the closed shop conditions. This finding was premised on the use by the ITU of its "bargaining" scheme including its Conditions of Employment or "no contract" strategy and its Form P-6A or "sixty day contract" strategy. The Board adopted the findings of the Trial Examiner that the negotiations taking place after August 23, 1947, throughout the country were marked, on the union side, by the use of the Conditions of Employment form, the adamant refusal of the union to enter into any contract, written or oral, with respect to employment conditions and by the publishing by the local unions and the respondents, through the "Conditions" form and otherwise, of the threat that union members would walk out if non-union men were employed. The Trail Examiner and the Board found that this idea of the union was further shown by the local unions' and the respondents' insistence that the absence of any contractual relations would enable the respondent ITU and the local unions to carry out the threat of a strike without incurring any liability under the Act, and that, in the view of the unions, the absence of a contract would provide them with such freedom in the formation of the strike issue as would enable them, in the event that the employers departed from closed shop practices, to cloak the threatened strike with a legitimate economic label.
 
 
 94
 § 8(b)(1)(B).
 
 
 95
 The Board also found that the respondent ITU and its officers were guilty of violating § 8(b)(1)(B) of the Act by engaging in coercive conduct designed to compel employers to continue hiring only union foremen in composing rooms. This subsection of the Act provides that it shall be an unfair labor practice for a labor organization to restrain or coerce "an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances". The decision of the Board recites the broad powers which the ITU "laws" required the employers to delegate to the foremen, including the power to adjust grievances and the power to hire and discharge individual employees. These "laws" also provided that the foreman was the "only recognized authority in the composing room." The Board held that the existence of coercion did not depend on the effect of coercion in a particular case; that: "It is enough, as here, that the Respondent threatened strike action--a coercive tactic calculated and designed to force the employers to capitulate to the foreman demands."
 
 
 96
 § 8(b)(6)
 
 
 97
 The Board held that the insistence of the respondents on the retention in all contracts of the provision requiring "reproduction" or "setting bogus" did not violate § 8(b)(6) of the Act; that such a requirement did not constitute " * * * an exaction, for services which are not performed or not to be performed", within the meaning of this provision of the Act.
 
 
 98
 § 8(b)(1)(A)
 
 
 99
 The Board dismissed all of the § 8(b)(1)(A) allegations of the complaint without passing on the sufficiency of the proof. This was done on the theory that the proviso in that subsection expressly providing: "That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein", absolutely protected labor organizations from being guilty of restraining or coercing employees in the exercise of their rights under § 7 of the Act so long as such restraint or coercion consisted only of the exercise by the labor organization of its rights over the acquisition or retention of membership in such organization. One of the charges of the complaint so dismissed was that the respondents refused and caused the subordinate locals to refuse to bargain collectively. While this specific conduct of respondents alleged to be a violation of § 8(b)(1)(A) would clearly have constituted a violation of § 8(b)(3), the complaint did not allege that such conduct violated § 8(b)(3).
 
 
 100
 Substantive Clauses of Form P-6A.
 
 
 101
 In the hearing before the Trial Examiner, the General Counsel contended that the substantive clauses (a), (b), (c), (d) and (e) of Form P-6A, considered separately and in various combinations, constituted that form a legally binding agreement to maintain a closed shop and that, therefore, the insistence on such clauses was invalid. However, the Trial Examiner, while not agreeing with this contention, was of the opinion that the sixty day cancellation provision of Form P-6A, considered alone, coerced the employers to discriminate against the employees in violation of § 8(b)(2). The Board found it "unnecessary" to pass upon the legality of these miscellaneous clauses in the Form P-6A Contract for the reason that it had therefore found that the P-6A phase of the ITU's "bargaining strategy," because of the sixty day cancellation provision, was designed to and did coerce employers into maintaining closed shop conditions, non-contractually, under threat of strike action. The Board was, therefore, of the opinion that decision as to the legality of such substantive clauses considered separately or in combination with others, could not change the scope of the remedial order which the Board proposed to issue.
 
 
 102
 Order of the Board.
 
 
 103
 The Board ordered that the respondents, the ITU and its officers and agents, cease and desist from:
 
 
 104
 "(1) Threatening to take strike action, or directing, instigating, or encouraging employees to engage in or to threaten to engage in, strike action, or approving or ratifying strike action taken by employees, for the purpose of requiring employers either non-contractually or as a matter of contractual obligation to violate Section 8(A)(3), by discriminating with respect to the employment or conditions of employment of any employee.
 
 
 105
 "(2) In any other manner causing or attempting to cause employers to discriminate against employees in violation of Section 8(a)(3) of the Act.
 
 
 106
 "(3) In any manner restraining or coercing employers in the selection of their representatives for the purposes of collective bargaining or the adjustment of grievances."
 
 
 107
 The ANPA in its petition to review and modify this order of the Board alleged that the Board had erred in (1) holding that the ITU had not violated certain sections of the Act; (2) failing to decide various issues raised by the complaint as to alleged unfair labor practices by respondents; and (3) not granting the relief sought against the ITU.
 
 
 108
 The prayer of the petition was that this Court review and modify the decision and order of the Board "and make and enter a decree in the following terms and words to wit: * * *." Then followed a proposed cease and desist order against the respondents, the ITU and its officers, to be entered as the decree of this Court.
 
 
 109
 In a former opinion in this case, 7 Cir., 190 F.2d 45, this Court granted the motion of the Board to strike that part of the prayer of the ANPA's petition to review which sought enforcement of that part of the Board's order which was favorable to the ANPA. This was done because the ANPA was not an "aggrieved person," within the meaning of § 10(f) of the Act, as to that part of the order which was favorable to its contentions. We there also concluded that it was for the Board, and not for this Court, to fashion the remedy and that if we were of the opinion, after a hearing on the merits, that a remedial order should have been issued by the Board, the case would be remanded to the Board for that purpose.
 
 Discretion to Withhold Decision
 
 110
 of Litigated Issues.
 
 
 111
 The ANPA insists that when the General Counsel has issued a valid complaint alleging that a labor organization has been or is committing unfair labor practices in violation of the Act, the Board is required by § 10 of the Act: (a) to make findings as to whether such labor organization has committed or is committing said acts; (b) if it finds that such labor organization has committed or is committing said acts, to decide whether said acts are unfair labor practices prohibited by the Act; and (c) to issue an order requiring said labor organization to cease and desist from such unfair labor practices and to take such affirmative action as will effectuate the policies of the Act.
 
 
 112
 The ANPA admits that the issuance of a complaint charging unfair labor practices is entirely within the discretion of the Board or its agents but insists that after the complaint has been issued the Board must proceed with a hearing, with findings and with an appropriate order based on such findings. In support of this contention the ANPA cites § 10(b) and § 10(c) of the Act which empowers the Board to issue a complaint "stating the charges * * * and containing a notice of hearing before the Board * * *."
 
 
 113
 Section 10(c) also provides that: "If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue * * * an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action * * * as will effectuate the policies of this Act * * *. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint." The ANPA contends that these sections of the Act leave the Board no discretion to refuse to decide each important issue presented to it by such a complaint. However, the Board here did not fail to decide whether the respondents were or were not "engaging in any such unfair labor practice". The Board merely refused to consider what at best would be cumulative evidence of an unfair labor practice already found.
 
 
 114
 Section 10(b), after providing for the issuance of a complaint, also provides that "Any such complaint may be amended by the * * * Board in its discretion at any time prior to the issuance of an order based thereon." These words would appear to give to the Board the express power to delete from, at least to some extent, as well as to add to the charges of the complaint. The Board is given the power to do this "at any time prior to the issuance of an order". Such an amendment could be made not only during the hearing but at any time subsequent to the hearing if it was done prior to the issuance of the order. It would seem inconsistent to give the Board the power to so dispose of a charge made by the complaint but to refuse to permit the Board to dismiss a portion of a charge of the complaint which the Board felt need not be further pursued.
 
 
 115
 The ANPA also relies on Carl J. Jacobsen v. N.L.R.B., 3 Cir., 120 F.2d 96, as supporting its contention that the Board erred in dismissing the substantive charges on P-6A. In that case, however, the Board dismissed the entire complaint after refusing to afford the complainant an opportunity to introduce sufficient evidence to show necessary impact on interstate commerce. The Court held that under the facts of that case the action of the Board was an abuse of its discretion. In its opinion the Court did say, 120 F.2d at page 100: "It will be noted that the jurisdiction of the Board is not a compulsory jurisdiction. Assuming that all circumstances looked to by the Act are in existence, none the less we are of the opinion that the Board does not have to cause a complaint to be issued against the employer or proceed to prohibit any unfair labor practices complained of. The course to be pursued rests in the sound discretion of the Board and is the concern of expert administrative policy. That discretion is not a legal discretion at least in so far that upon the abuse of it the several circuit courts of appeals might compel the Board to issue a complaint. The jurisdiction of the courts of appeals to review the actions of the National Labor Relations Board is conferred by statute and review of the Board's actions must rest within the statutory power granted to the reviewing courts under Sections 9 and 10 of the Act, 29 U.S.C.A. §§ 159 and 160."
 
 
 116
 That case presented an entirely different situation, both factually and legally, from the one with which we are here confronted. Here the Board found the ITU guilty of unfair labor practices in violation of § 8(b)(2) of the Act in that the union by its bargaining policy, including its insistence first on the use of its Conditions of Employment and then on the P-6A Contract Form, with a sixty day cancellation clause, was coercing the employer into a closed shop in discrimination against nonunion employees. The miscellaneous clauses of the Form P-6A Contract, on which the ITU insisted, were a part of the ITU's general bargaining policy which the Board condemned. The Board issued a broad order directing the ITU to cease and desist from threatening strike action, or directing or encouraging employees to threaten or to take strike action, for the purpose of requiring employers to violate § 8(a)(3) of in any other manner causing or attempting to cause employers to discriminate against employees in violation of § 8(a)(3). While it seems perfectly clear that the insistence of the ITU on the inclusion as a whole of the substantive clauses of the Form P-6A in all collective bargaining contracts might be in furtherance of the ITU's condemned bargaining scheme, we are of the opinion that it was not necessary for the Board to consider the validity of such clauses separately. It would seem that the further insistence on the use of these substantive clauses as a coercive scheme to secure a closed shop would be in violation of the broad terms of the Board's order and could be stopped by enforcement of the Board's order. In Evans v. I.T.U., D.C., 81 F.Supp. 675, the decision holding the ITU in contempt, it was demonstrated that a union could not avoid the consequences of its violation of a court's order enjoining its unfair labor practices by merely changing those activities to activities of a slightly different type or nature which had not been specifically litigated but which were used by the union to accomplish the same prohibited results. We would not consider the decision of the Board as to the validity of the separate clauses of the P-6A Contract Form necessary to a later enforcement of the Board's order against coercive use of such clauses in a manner to cause discrimination by employers against non-union employees in violation of § 8(a)(3).
 
 Failure to Find That The ITU Failed to
 
 117
 Bargain in Good Faith.
 
 
 118
 The complaint before the Board in this case alleged that the ITU restrained or coerced employees in the exercise of the rights guaranteed by § 7 of the Act by refusing and causing its subordinate unions to refuse to bargain collectively in good faith. It was alleged that this action on the part of the ITU constituted a violation of § 8(b)(1)(A) of the Act but the complaint failed to allege that such action constituted a violation of § 8(b)(3). The Board held that the acts alleged in the complaint as constituting violations of § 8(b)(1)(A) did not come within the prohibition of that subsection of the Act and apparently was under the impression that, since the particular action alleged was not alleged to be a violation of § 8(b)(3), it was required to dismiss this charge without passing upon the sufficiency of the proof. We think this action of the Board, in so dismissing the charge of failure to bargain in good faith, constituted error. There was an abundance of evidence here to support a finding that the ITU and its agents did fail to bargain in good faith and the record clearly indicates that the ITU recognized this as one of the charges against it. The failure to specify in the complaint the correct subsection of the Act did not require the Board to dismiss this charge without a consideration as to the sufficiency of the proof. Where, as here, the complaint clearly describes an action which is alleged to constitute an unfair labor practice but fails to allege which subsection of the Act has been violated or alleges the wrong subsection, such failure or mistake, if it does not mislead the parties charged, does not prevent the Board from considering and deciding the charge so presented.
 
 
 119
 In the rules and regulations promulgated by the Board to cover procedure before it, the Board recognized that the accomplishment of the broad purposes of the Act should not be hindered nor prevented by technicalities in procedure. This is shown by the fact that in these rules and regulations the Board provided that: "These Rules and Regulations shall be liberally construed to effectuate the purposes and provisions of the Act." 29 U.S.C.A. § 102.93.
 
 
 120
 The function of the complaint in such an unfair labor practice was well stated in National Labor Relations Board v. Piqua Munising Wood Products Co., 6 Cir., 109 F.2d 552, 557, where the Court stated: "The sole function of the complaint is to advise the respondent of the charges constituting unfair labor practices as defined in the Act, that he may have due notice and a full opportunity for hearing thereon. The Act does not require the particularity of pleading of an indictment or information, nor the elements of a cause like a declaration at law or a bill in equity. All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put upon his defense. (Citing cases.)" The complaint in the instant case was adequate to meet these requirements.
 
 
 121
 § 8(b)(1)(A)
 
 
 122
 The ANPA contends that the Board's interpretation of § 8(b)(1)(A) is too narrow; that the proviso to this section does not permit the ITU to restrain or coerce employees in the exercise of the rights granted by § 7 of the Act. The ANPA points out that expulsion from ITU membership may involve the loss by the employee of his job and other economic benefits such as pension and mortuary provisions and that the threat of such deprivation certainly constitutes restraint and coercion upon an employee's right to refuse to join or take part in union activities. The Board insists, however, that the proviso to this section prevents the threat from being in violation of this section. The proviso declares that: "This paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein". This proviso is attached to § 8(b)(1)(A) as a limitation on this particular definition of an unfair labor practice. It was within the legislative power of Congress to make or not to make the restraint or coercion of employees an unfair labor practice. If Congress chose to make such action illegal it could attach such limitations as it chose to the definition. The ANPA contends that the argument of the Board on this point is analogous to the claim that the right of free speech guaranteed by the First Amendment protected an employer in coercing employees by the use of speech as a part of an anti-union pattern of conduct.
 
 
 123
 The difference is that the coercion of employees by a labor organization is illegal only to the extent that it is declared so by Congress. In this section of the Act Congress has said that only such action was illegal which would "not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership". Under this limitation Congress left labor organizations free to adopt any rules they desired governing membership in their organizations. Members could be expelled for any reason and in any manner prescribed by the organization's rules, so far as § 8(b)(1)(A) is concerned. This interpretation has support in the legislative history of the Act. It is also significant that while the Board has been so interpreting this section of the Act during the past four years, Congress has not amended the section to indicate that a broader interpretation of the section was intended or desired. It is not within the power of the courts to write into this section of the Act, by interpretation, language which would broaden its scope.
 
 
 124
 Nor can we agree with the contention of the ANPA that a violation of other subsections of 8(b) are also necessarily violations of § 8(b)(1)(A) in the same manner that violations of other subsections of § 8(a) have been held to be violations of § 8(a)(1). In Teller, Labor Disputes and Collective Bargaining (1950 Supplement), it is stated at page 82, § 398.48: "The fact that the union's actions are unfair labor practices under other subdivisions of Section 8(b) does not make them violations of 8(b)(1)(A), which is, as stated above, concerned only with clearly non-peaceful or otherwise specifically unlawful labor activity. A union's refusal to bargain in violation of the Act, or its insistence (based on a desire not to interfere with the rights of employees but to protect its own interests) on an illegal hiring hall arrangement is accordingly not violative of 8(b)(1)(A)."
 
 
 125
 Reproduction or Setting of Bogus as Violation of Section 8(b)(6)
 
 
 126
 In this section of the Act we are again confronted with a situation where Congress could have outlawed all so-called "feather-bedding" but apparently did not see fit to do so. Instead Congress declared in § 8(b)(6): "It shall be an unfair labor practice for a labor organization or its agents * * * to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed."
 
 
 127
 The ANPA insists that this language is sufficient to cover the reproduction or "setting bogus" practice which had prevailed in composing rooms for many years and which the ITU insisted be continued.
 
 
 128
 With this contention we cannot agree. The legislative history of the Act clearly indicates that Congress did not intend by this section to cover all types of "feather-bedding." While the ANPA contends that Congress, by using the words "exaction" and "services," has made this section so clear that it is not subject to interpretation, we note that there was much discussion and some disagreement in Congress as to its correct interpretation and that the parties here are in sharp disagreement as to what the section means.
 
 
 129
 While this question was before Congress the House Bill defined several practices as feather-bedding and prohibited strike activity to compel an employer to accede to any such practices. The Senate Bill contained no such prohibition. The Conference Committee compromised the matter by agreeing on § 8(b)(6) in its present form. Senator Taft in explaining this provision to the Senate said: "The House had rather elaborate provisions prohibiting so-called feather-bedding practices and making them unlawful labor practices. The Senate conferees, while not approving of feather-bedding practices, felt that it was impracticable to give to a board or a court the power to say that so many men are all right and so many men are too many. It would require a practical application of the law by the courts in hundreds of different industries, and a determination of facts which it seems to me would be almost impossible. So we declined to adopt the provisions which are now in the Petrillo (Lea) Act. * * * We thought that probably we had better wait and see what happened, in any event, even though we are in favor of prohibiting all feather-bedding practices. However, we did accept one provision which makes it an unlawful labor practice for a union to accept money for people who do not work. That seemed to be a fairly clear case, easy to determine. * * *." (Emphasis supplied.) 96 Cong.Rec. 6441, Leg.Hist. p. 1535.
 
 
 130
 Senator Taft by this statement clearly indicated that in his opinion the only practice covered by § 8(b)(6) was the practice of demanding money where no work had been done. He explained further, however, that the section did not even cover all cases where employees were paid for time during which they did not work, such as rest periods, time for lunch and vacation periods; that such periods were merely incidental to the work for which the employee was hired and paid. Examples of practices covered by the section were explained by Senator Taft as follows: " * * * it seems to me that it is perfectly clear what is intended. It is intended to make it an unfair labor practice for a man to say, 'You must have 10 musicians, and if you insist that there is room for only 6, you must pay the other 4 anyway.' That is in the nature of an exaction from the employer for services which he does not want, does not need, and is not even willing to accept." (93 Cong.Rec. 6603).
 
 
 131
 Senator Ball in speaking in favor of this section also said that it applied to a situation where an employer is required to pay for a stand-by orchestra, "which does not work at all." (93 Cong.Rec. 7683).
 
 
 132
 In the instant case the pay for "setting bogus" was only for the time the employee actually worked in setting the "bogus," amounting to approximately five per cent of his total working time. He was a regular employee, not hired merely to set "bogus," but hired to do composition work which the employer required. While the "bogus" was not ordinarily used by the employer, the necessary work to compose it was actually done by the employee. Requiring that the employer pay for such work was not a violation of § 8(b)(6).
 
 
 133
 We conclude that the actions and order of the Board in this case were correct with the exception of the Board's failure to make a finding and an appropriate order on the allegation of the complaint that the ITU and its agents had failed to bargain collectively in good faith. That part of the case is, therefore, remanded to the Board for the purpose of making a finding on this charge and an appropriate supplementary order based thereon.
 
 
 134
 Cases No. 10331 and No. 10332.
 
 
 135
 These cases involve petitions by the Board for the enforcement of the cease and desist orders it entered against the ITU and its agents in the Board's Case No. 9-CB-5, the ANPA case, the same order we have considered in our Case No. 10329, and against the ITU and its Chicago local in the Board's Case NO. 13-CB-6, the Chicago case, No. 10332 here. Both of these orders were entered by the Board on the same day, October 28, 1949.
 
 
 136
 These two cases present the following questions which were not covered above in our discussion of the ANPA case, No. 10329:
 
 
 137
 (1) Whether the Board properly found in both cases that the respondents therein named, the ITU and its agents in the ANPA case and the ITU and its Chicago local in the Chicago case, violated § 8(b)(2) of the Act by coercing employers to compel them to agree to the ITU's bargaining scheme which was designed primarily to effect the maintenance of closed shop conditions.
 
 
 138
 (2) Whether the Board in the Chicago case properly held (a) that the ITU and its Chicago local were under a statutory duty to bargain collectively, and (b) that they had refused to bargain within the meaning of § 8(b)(3) of the Act.
 
 
 139
 (3) Whether the Board in the ANPA case properly found that the ITU restrained and coerced the employers in the selection of their representatives for the purpose of the adjustment of grievances in violation of § 8(b)(1)(B) of the Act.
 
 
 140
 Violation of § 8(b)(2).
 
 
 141
 The Board found in both of these cases that the respondents had violated § 8(b)(2) of the Act which provides: "It shall be an unfair labor practice for a labor organization or its agents * * * to cause or attempt to cause an employer to discriminate against an employee in violation of subsection 8(a)(3) * * *." (Our emphasis.)
 
 
 142
 The Board held that ITU and its agents in the ANPA case and the ITU and its Chicago local in the Chicago case violated this section of the Act by insisting, on threat of strike, that the employers maintain closed shop conditions. Subsection 8(a)(3) provides that under conditions such as those here involved it is an unfair labor practice for an employer to discriminate in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage union membership.
 
 
 143
 The ITU contends that neither the record nor the evidence sustains the findings of the Board in these two cases on this question. The ITU first contends that to show a violation of § 8(b)(2) there must be a showing that "particular employees or applicants were the actual or intended objects" of the discriminatory scheme. In National Labor Relation Board v. National Maritime Union, 2 Cir., 175 F.2d 686, 689, it was pointed out that the Board in discussing this question had said: "In our view, the prohibition is not confined to those instances in which specific non-union employees are unlawfully discriminated against. It extends as well to instances in which the union, or its agents, seeks to cause the employer to accept conditions under which any non-union employee or job applicant will be unlawfully discriminated against. The acts of the Respondents in the instant case fall squarely within this prohibition."
 
 
 144
 The Court approving this statement of the Board there said, 175 F.2d at page 689: "Like the Board, we see no rational basis for respondents' argument that Section 8(b)(2) does not make it an 'unfair labor practice' to attempt to cause an employer to discriminate against a group of employees or potential employees but only against some specified employees or potential employees."
 
 
 145
 We likewise agree that the use in this subsection of the words "an employee" does not require such a narrow interpretation as would limit the application of the subsection to those cases where a particular employee or employees are involved. See also United Mine Workers v. N.L.R.B., 87 U.S.App.D.C. 230, 184 F.2d 392.
 
 
 146
 The ITU also argues that in these two cases there was no showing that the ITU did more than to cause or attempt to cause "an employer to do more than create the possibility of discrimination at some indefinite future time." With this we cannot agree. Under the coercion of threats of strikes and strikes the ITU, its agents and its locals attempted to secure the maintenance of the closed shop conditions which would discriminate against non-union employees in violation of § 8(a)(3). In many, many cases the employers acceded to the coercive demands of the ITU, and, either non-contractually under the Conditions of Employment or under the Form P-6A, did maintain its closed shop conditions contrary to the provisions of § 8(a)(3). It cannot be seriously contended that where the employers actually yielded to these coercive demands and maintained closed shop conditions, non-union employees were not discriminated against.
 
 
 147
 The ITU contends that in the ANPA case the complaint charged only "attempting" to cause the employers to discriminate, that the Trial Examiner found only "attempts" to cause employers to discriminate and that, therefore, the Board's finding that the ITU caused discrimination was not authorized. The ITU also contends that there was no evidence to support such a finding.
 
 
 148
 Only by a technical interpretation of the complaint can we say that the complaint failed to charge "causing" discrimination. Paragraph V of the complaint alleged that respondents "attempted to cause and are attempting to cause" employer discrimination by (a) imposing conditions of employment which cause or attempt to cause employment discrimination; (b) demanding contracts which cause or attempt to cause employers to discriminate against employees; and (c) causing locals to do the same. The complaint also alleged that respondents restrained and coerced employees by causing or attempting to cause employers to discriminate against employees as set forth in Paragraph V of the complaint. These allegations were sufficient to put the respondents on notice that they were also being charged with having caused such discrimination and to enable them to defend against such a charge.
 
 
 149
 There was sufficient evidence to sustain a finding that the respondents had caused such discrimination. The Trial Examiner in his Intermediate Report stated: "Realistically viewed it appears obvious that the application of closed shop hiring practices, especially where generally known to exist as they must be where ITU hiring procedures are followed, operates in a discriminatory manner against all prospective non-union applicants for employment."
 
 
 150
 The Trial Examiner then pointed out, however, that violation of § 8(b)(2) does not depend on a showing that § 8(a)(3) has been actually breached or that any specific individual was the object of discrimination. The Intermediate Report shows that the Trial Examiner failed to find that the respondents had caused discrimination only because he did not consider it necessary to a finding that they had violated § 8(b)(2). We refer to the statements of the Trial Examiner only to show that his opinion on this question was not inconsistent with the finding of the Board. Of course, if there had been inconsistency, the opinion and finding of the Board would control, where, as here, it was based on a charge supported by sufficient evidence.
 
 
 151
 Violation of § 8(b)(3).
 
 
 152
 In the Chicago case the complaint alleged that the respondents, the ITU and its Chicago local, were, at all times here involved, the designated exclusive bargaining representatives of all the employees of the Chicago newspaper publishers represented by the CNPA and, as such representatives, the respondents refused to bargain collectively in good faith. The Trial Examiner found that the evidence sustained this charge and concluded that the respondents, and each of them, by refusing to bargain collectively in their capacity as exclusive bargaining representatives of the employees, had engaged in unfair labor practices contrary to the prohibition of § 8(b)(3) of the Act. The Board agreed with the findings and conclusions of the Trial Examiner on this point and ordered both respondents to cease and desist from refusing to bargain collectively, and, affirmatively, that upon request the respondents bargain collectively.
 
 
 153
 There can be no real doubt but that consideration of the entire record in the Chicago case shows that the Board was fully justified in finding that both respondents failed to bargain in good faith. The respondents attempted to justify their actions by the statement found in § 8(d) of the Act which provides that the obligation to bargain in good faith "does not compel either party to agree to a proposal or require the making of a concession." This provision does not mean that either party may comply with the duty to bargain by entering into and participating in negotiations with a fixed and determined purpose of avoiding the making of an agreement. Here the Chicago local, under the direction, supervision and control of the ITU, started negotiations by a meeting with representatives of the CNPA on July 30, 1947. The union was represented by the Scales Committee of the Chicago local. There was testimony that at that first meeting President Pilch of the Chicago local opened the discussion by saying that his committee was functioning under instructions of the ITU and that they could not submit formal proposals as they had in the past; that at the second meeting Mr. Pilch said, "you know we must follow International Law"; and that at a meeting on August 13th Mr. Pilch said that the union would not permit a non-union man to post his name on the priority board, and there was no other way of obtaining work in the composing room.
 
 
 154
 Here there was evidence from which the Board could find that from the start of the negotiations the Chicago local was strictly following the "no contract" policy dictated by the ITU, as described above, and was openly defying the provisions of the Act which required good faith collective bargaining.
 
 
 155
 According to some of the testimony the same attitude prevailed later when President Randolph and two members of the Executive Council of the ITU personally participated in the negotiations. It was testified that President Randolph at one of the negotiating meetings made the statement that, "We have got now what we intend to keep, courts or no courts, Congress notwithstanding."
 
 
 156
 But, the ITU insists that it was not required to bargain collectively with employers by § 8(b)(3) of the Act because it was not " * * * the representative of * * * employees subject to the provisions of" § 9 of the Act. Section 9(a) of the Act provides: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: * * *."It is admitted that no formal bargaining designations are signed by ITU members. The question of who was the designated bargaining representative of the employees here was, therefore, a question of fact to be resolved by the Board upon consideration of all of the relevant evidence bearing on the question. From a consideration of the entire record in the Chicago case we cannot say that the finding of the Board that the ITU and the Chicago local and each of them were the exclusive bargaining representatives of the employees was not supported by substantial evidence or was clearly erroneous. The finding of the Board on this question must, therefore, prevail. See National Labor Relations Board v. E.A. Laboratories, Inc., 2 Cir., 188 F.2d 885, 888.
 
 
 157
 Violation of § 8(b)(1)(B).
 
 This section of the statute provides that:
 
 158
 "(b) It shall be an unfair labor practice for a labor organization or its agents--
 
 
 159
 "(1) to restrain or coerce * * * (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;"
 
 
 160
 The complaint in the ANPA case alleged that the ITU and its agents had been and were violating this section of the Act by insisting and requiring and by causing its locals to insist and demand that the employers hire only union foremen.
 
 
 161
 The respondents contend that the ITU's demand for union foremen was lawful; that since foremen are not "employees" under the Act, employers may hire or fire them because of their becoming or ceasing to be members of a union.
 
 
 162
 However, the Trial Examiner and the Board found that here the insistence of the ITU for union foremen was an integral and inseparable part of the ITU bargaining policy having for its purpose the maintenance of closed shop conditions by holding the employers under constant threat of an immediate or imminent strike and that this was a violation of § 8(b)(1)(B). Respondents apparently admit that these foremen are management representatives for the purpose of the adjustment of grievances within the meaning of this section of the Act, but insist that there was no coercion or restraint. They say that there was no threat of a strike conditioned on the employer's failure to accede to the demand for a union foreman, and that there was no showing that any publisher resisted or even objected to the appointment of union foremen. They thus imply that there could be no violation of this section of the Act unless their demands met with and overcame resistance on this particular point.
 
 
 163
 Here, however, their insistence on union foremen was a very important part of their scheme for the maintenance of the closed shop conditions. The foreman had the authority to hire and fire other employees in the composing room. As a member of the ITU the foreman had taken the oath "to use all honorable means within my power to procure employment for members of the International Typographical Union in preference to all others." By the General Laws of the ITU the foreman was to be in complete charge of composing room operations, and "the only recognized authority" to give orders directly to the employees. The respondents apparently thought that union foremen were important to their general scheme for maintaining closed shop conditions. The fact that their threat of strike action was directed to the enforcement of the entire scheme and that there was no special threat to secure this particular point is not important. ITU foremen were secured as a part of their general scheme. The general scheme was secured by threats of strike, by restraint and coercion. Considering the record as a whole we find no basis for saying, contrary to the finding of the Trial Examiner and of the Board, that the respondents, the ITU and its agents did not restrain and coerce the employers in the selection of their representatives for the purposes of the adjustment of grievances in violation of § 8(b)(1)(B) of the Act. See Progressive Mine Workers v. N.L.R.B., 7th Cir., 187 F.2d 298, 301.
 
 
 164
 The orders entered by the Board in its cases numbered 9-CB-5 and 13-CB-6 will be enforced.Case No. 10356.
 
 
 165
 This case involves a petition to review and modify the decision and order of the Board in the proceeding brought against the ITU and its locals in the printing industry upon charges filed by the PIA. As in Case No. 10329, the PIA, representing the original complaining employers, protests the decision of the Board dismissing certain allegations of the complaint.
 
 
 166
 The complaint in this proceeding charged the respondents with the following unfair labor practices: (1) refusal of the locals to bargain collectively in good faith, in violation of § 8(b)(3); (2) insistence by the ITU and the locals upon the maintenance of closed shop conditions, in violation of § 8(b)(2); and (3) restraint and coercion by the ITU and its locals of employees in the exercise of their § 7 rights by enforcing union rules upon them, and by other alleged unfair labor practices, in violation of § 8(b)(1)(A). During the hearings, upon the request of the respondents, the Trial Examiner also considered actions of the unions subsequent to the issuance of the complaint, principally in connection with the contract signed in Detroit in 1948.
 
 
 167
 The Board found that respondent locals had refused to bargain collectively in good faith, and that all respondents had insisted upon closed shop conditions. The Board entered an appropriate order, similar to that in the other cases. The Board dismissed the allegations under § 8(b)(1)(A) for the same reasons assigned in the ANPA and Chicago cases. As in the previous cases the Board refused to consider the question of the legality of the insistence by the unions upon inclusion in all contracts of the substantive clauses (a) through (i) of Form P-6A. Furthermore, the Board refused to consider the legality of the policy adopted by the unions subsequent to the issuance of the complaint. The PIA seeks a review here of these dismissals and refusals to review by the Board.
 
 
 168
 For the same reasons as were set out in the preceding cases, the PIA cannot succeed on this petition. First, it is clear from the wording of § 8(b)(1)(A) that it is not a general clause which also prohibits the unfair labor practices described in the subsequent paragraphs of subsection 8(b). Second, the proviso in § 8(b)(1)(A) permits unions to enforce their internal policies upon their membership as they see fit. Third, since the Board found as to each alleged unfair labor practice that there had or had not been a violation of the Act, and entered appropriate and adequate preventive orders, it was not an abuse of its discretion to find that it was unnecessary at that time to consider all other actions of the unions which might furnish cumulative proof of these practices.
 
 
 169
 The petition of the PIA to modify the decision and order of the Labor Board in Case No. 10356 must be denied.
 
 
 170
 In summary, the decision of this Court in these four cases is as follows: The petitions of the National Labor Relations Board for enforcement of its orders in cases 10331 and 10332 are granted. The orders against the respondents will be enforced. That part of the Board's decision and order in case 10329 which dismissed the charge that the ITU and its agents refused to bargain collectively in good faith is remanded to the Board for consideration and decision upon the merits of the charge. In all other respects the petitions of the moving complainants in cases 10329 and 10356 are denied.